C. D. HUNT, JR., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Hunt v. Commissioner
Docket Nos. 32817-85; 34904-85; 44871-85; 45324-85; 45438-85; 445-86; 3276-86; 9733-86; 11311-86; 19966-86; 22009-86; 30119-86; 6548-87; 20782-87; 35654-87
United States Tax Court
T.C. Memo 1989-660; 1989 Tax Ct. Memo LEXIS 660; 58 T.C.M. (CCH) 965; T.C.M. (RIA) 89660; December 18, 1989
Henry D. Gamble, for the petitioners. Frank C. McClanahan, III, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: These cases were assigned to Special Trial Judge Stanley J. Goldberg pursuant to section 7443A(b)(4) of the Internal Revenue Code of 1986 and Rule 180 et seq. [2] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. *662 OPINION OF THE SPECIAL TRIAL JUDGE GOLDBERG, Special Trial Judge: Respondent determined deficiencies in and additions to petitioners' Federal income taxes for the years and in the amounts as follows: Docket No.
Petitioner
Year
Deficiency
32817-85
C. D. Hunt, Jr.
1983
$ 4,336
34904-85
Thelma B. Brown
1983
$ 3,433
44871-85
David Reid, III
1980
$   890
and Gloria J.
1982
$ 4,116
Reid
1983
$ 3,871
45324-85
Exter G.
1980
$ 3,028
Gilmore, Jr.
1983
$ 5,492
and Olivia G.
Gilmore
45438-85
Larry T. Suitt
1983
$ 7,922
and Gwendolyn
C. Suitt
445-86
Lee Johnson, Jr.
1979
$ 2,834
and Veronica B.
1980
$ 4,134
Johnson
1981
$   915
1982
$ 4,407
3276-86
Lenard Latimer
1980
$ 4,260
and Ruth M.
1981
$ 3,140
Latimer
1983
$ 4,586
9733-86
Wilbert Joseph
1983
$ 4,495
Hamilton and
Geneva A.
Hamilton
11311-86
Jackie Robinson
1979
$ 3,409.50
and Carolyn K.
1980
$   590.50
Robinson
1982
$ 4,232
19966-86
Christine M.
1979
$ 1,681
Powell
1980
$ 3,742
1981
$    58
1982
$ 2,591
22009-86
Jackie Dale
1979
$ 3,960
McDuffy and
1980
$ 5,232
Patricia Alford
McDuffy
30119-86
Alfonzo and
1980
$ 2,835
Beatrice
1981
$ 2,366
Hamilton, Jr.
1983
$ 4,157
6548-87
Ronald Daye and
1983
$ 4,156
35654-87
Bobbie Daye
1984
$   622
20782-87
Ronald Eric
1983
$ 7,660.40
Johnson and
Rosetta B.
Johnson
*663 Additions to Tax Section
Docket No.
Petitioner
6651(a)(1)
6653(a)
6653(a)(1)
6653(a)(2)
32817-85
C. D. Hunt, Jr.
--
--
$ 216.80
*
34904-85
Thelma B. Brown
--
--
$ 171.65
*
44871-85
David Reid, III
--
$  45
--
--
and Gloria J.
--
--
$ 206
*
Reid
--
--
$ 194
*
45324-85
Exter G.
--
$ 151
--
--
Gilmore, Jr.
--
--
$ 275
*
and Olivia G.
Gilmore
45438-85
Larry T. Suitt
--
--
$ 396
*
and Gwendolyn
C. Suitt
445-86
Lee Johnson, Jr.
--
--
--
--
and Veronica B.
--
--
--
--
Johnson
--
--
--
--
--
--
--
--
3276-86
Lenard Latimer
--
$ 213
--
--
and Ruth M.
--
--
$ 157
*
Latimer
--
--
$ 229
*
9733-86
Wilbert Joseph
$ 46
--
$ 230
*
Hamilton and
Geneva A.
Hamilton
11311-86
Jackie Robinson
-- $ 170.48
--
--
and Carolyn K.
-- $  29.53
--
--
Robinson
-- --
$ 216.90
*
19966-86
Christine M.
-- $  84
--
--
Powell
-- $ 187
--
--
-- --
$   3
*
-- --
$ 130
*
22009-86
Jackie Dale
-- --
--
--
McDuffy and
-- --
--
--
Patricia Alford
McDuffy
30119-86
Alfonzo and
-- $ 142
--
--
Beatrice
-- --
$ 118
*
Hamilton, Jr.
-- --
$ 208
*
6548-87
Ronald Daye and
-- --
$ 207.80
*
35654-87
Bobbie Daye
-- --
$  31.10
*
20782-87
Ronald Eric
-- --
--
--
Johnson and
Rosetta B.
Johnson
*664 Docket No.
Petitioner
6659
6661
32817-85
C. D. Hunt, Jr.
$ 1,300.80
--
34904-85
Thelma B. Brown
$ 1,029.90
--
44871-85
David Reid, III --
--
and Gloria J.
$ 1,200
--
Reid
$   933
--
45324-85
Exter G.
$   908
--
Gilmore, Jr.
$ 1,497
$ 50
and Olivia G.
Gilmore
45438-85
Larry T. Suitt
$ 2,377
--
and Gwendolyn
C. Suitt
445-86
Lee Johnson, Jr.
$   850
--
and Veronica B.
$ 1,240
--
Johnson --
--
$ 1,235
--
3276-86
Lenard Latimer
$ 1,278
--
and Ruth M.
$   942
--
Latimer
$ 1,376
--
9733-86
Wilbert Joseph
$ 1,200
--
Hamilton and
Geneva A.
Hamilton
11311-86
Jackie Robinson
$ 1,022.85
--
and Carolyn K. --
--
Robinson
$ 1,200
--
19966-86
Christine M.
$   504
--
Powell
$ 1,123
-- --
--
$   708
--
22009-86
Jackie Dale
$   833.70
McDuffy and
$ 1,569.60
Patricia Alford
McDuffy
30119-86
Alfonzo and
$   851
--
Beatrice
$   710
Hamilton, Jr.
$   840
--
6548-87
Ronald Daye and
$ 1,246.80
--
35654-87
Bobbie Daye --
--
20782-87
Ronald Eric
$ 2,085.65
--
Johnson and
Rosetta B.
Johnson
*665 Respondent further determined that petitioners are liable for additions to tax under section 6621(c), formerly 6621(d). [3]
For the most part, the deficiencies are attributable to the disallowance of investment tax credits, investment tax credit carrybacks, lease payments, and distributor fees claimed by petitioners in connection with a master recording leasing activity. After concessions by some petitioners, the issues remaining for decision are: (1) whether petitioners are entitled to deductions and credits claimed with respect to their investments in certain master recordings; and (2) whether petitioners are liable for the various additions to tax determined by respondent. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of facts and attached exhibits are incorporated herein by reference. All petitioners were residents of North Carolina *666 when they filed their petitions. Background
In March 1982, Alfred Masters and John Olive formed Music Masters, Ltd. (Music Masters). Music Masters was formed for the purpose of purchasing master recordings (masters) and leasing the masters to investors. Investors were to contract with distributors who would manufacture and market recordings from the masters. During 1982 and 1983, Music Masters purchased approximately 135 Masters from Gold Shield Productions, Inc. (Gold Shield) and from Hice Music Corporation (Hice). Music Masters agreed to pay $ 1,000,000 for each single LP master and $ 2,000,000 for each double LP master. The record shows that Gold Shield acquired the following masters at a fraction of those prices shortly before Music Masters purchased them: Date Acquired by
Price Paid by
Master (Artist)
Gold Shield
Gold Shield
Sly and the
12/82
$ 2,500
the Family Stone
Carl Perkins
12/82
$ 2,500
Gladys Knight and
12/82
$ 2,500
the Pips
Music Masters purchased these and other masters with a small cash down payment and a purported recourse promissory note generally equal to 98 to 99 percent of the stated purchased price. The *667 principal payable under these notes totaled $ 112,963,900, with interest accruing at 9 percent per year. Under the terms of the notes, no payments of principal or interest were due for 12 years, except from one-third of the profits Music Mastersreceived through sales of records and tapes produced from the masters. By May 1988, Music Masters had paid no more than $ 10,000 on the outstanding notes. The Promotion
Music Masters began promoting the "Master Sound Recording Lease Program" (leasing program) in 1982, by preparing promotional material and distributing it at seminars and other meetings of potential investors. The promotional brochure claims the leasing program is "based primarily on profit potential." However, the obvious focus of the brochure is on the tax benefits of the program. Indeed, the brochure is filled with terminology from the Internal Revenue Code, including citations to various sections of the Code and to the regulations. The alleged availability of an investment tax credit was featured prominently in the brochure as a benefit of investing in the program. The brochure also informed the investor that lease payments and distribution costs were deductible *668 as business expenses on Schedule C. Potential investors had access to several tax opinions which had been prepared for Music Masters by a C.P.A. and by a tax attorney. The tax attorney also was "available" to answer questions investors had about the leasing program. The tax opinions, which are based on information provided by Music Masters, discuss the investment tax credit at length. Investors were urged to seek their own counsel before entering the leasing program. The leasing program was devised such that each master owned by Music Masters was divided into 25 units. Each unit represented a 4 percent leasehold interest in a master. Units were leased to investors/lessees for a term of 90 months (7-1/2 years), in exchange for which the lessee agreed to pay a minimum monthly rental. The program offered lessees a deferred payment plan under which the first payment was made by certified check upon execution of the lease, and the remaining 14 payments were paid monthly by bank draft. Music Masters offered lessees different leasing plans which employed different marketing techniques. The "TV/RADIO" plan used television and radio advertisements for direct response sales of double *669 LP albums through a toll-free telephone number. In the "REGULAR" plan, single LP albums were distributed for sales through record shops and variety stores. The lessee selected a leasing plan when he executed his lease. Upon executing a lease, the lessee entered into a separate "Manufacturing and Distribution Agreement" with a distributor. In these cases the distributors were Future Sound Marketing, Inc. (Future Sound) and Galaxy, Ltd. (Galaxy). The distributor charged the lessee a fee to manufacture and market recordings produced from the master. The amount of the distribution fee was dependent upon the number of units leased and on the leasing plan selected by the lessee. The promotional brochure, the lease agreement, and the distribution agreement require the lessee to exploit the master independently of either distributor. Included with the promotional material was a cash flow analysis of the "REGULAR" program. The analysis projects that at an average retail price of $ 7.45 per album, the lessee with one leasehold unit would need to sell 83,600 albums in order to recoup his cash investment in the leasing program. Furthermore, more than 600,000 albums would have to be sold *670 in order for Music Masters to pay just the principal due on the typical note executed by Music Masters for one master. The sale of 500,000 albums is considered a gold album in the music industry. Appraisals
Music Masters ordered appraisals to support the prices it had paid for the masters. The purchase price of each master was provided to the appraisers and this price formed the basis for the appraisers' determination of "fair market value." See United States v. Music Masters, Ltd., 621 F. Supp. 1046 (W.D.N.C. 1985), affd. without opinion 816 F.2d 674 (4th Cir. 1987). With the exception of double LP masters which were appraised at $ 2,000,000 each, all appraisals suggested a $ 1,000,000 value for each of the masters. The Embers double LP master has a fair market value of $ 10,000. The fair market value of the single LP masters ranges between $ 1,000 and $ 5,000. Petitioners' Transactions
Petitioners in these cases learned of the Music Masters leasing program through friends and coworkers. They attended seminars and meetings at which representatives of Music Masters promoted the leasing program. At these meetings, petitioners received *671 the promotional material and were given the opportunity to ask questions. Petitioners had no experience or expertise in the master recording industry. Before investing in the leasing program, petitioners did not listen to the masters they leased. They did not seek independent appraisals for their masters, and they did not obtain expert advice on the economic viability of leasing masters. Although some petitioners discussed the promotion with attorneys and accountants who were not associated with the promotion, the information they sought was limited to: (1) whether the lease agreement was a valid and enforceable contract; and (2) whether the investment tax credit really existed. All petitioners had high school educations, most petitioners had completed some work on the college level, and several petitioners were employed in managerial or supervisory positions. Although some petitioners were able to choose the masters they wanted to lease, some petitioners were given no choice. Petitioners leased interests in the following masters: Petitioner
Year
Master (Artist)
% Leased
Hunt
1983
Tommy Faile
4 Brown
1983
Silver Eagle Band
4
1983
Oliver
4
Reid
1982
Sly and the Family Stone 4
1983
Buddy Greco Country
4
Gilmore
1983
Fabulous Kays
8
Suitt
1983
Fabulous Kays
8
Johnson, Jr.
1982
Carl Perkins
12
Latimer
1983
Oliver
12
Hamilton
1983
Warner Mack
4
Robinson
1982
Sly and the Family Stone
4
1982
Gladys Knight and the Pips
4
Powell
1982
Gladys Knight and the Pips
8
McDuffy
1982
The Embers
4
Hamilton, Jr.
1983
Jimmy Gateley
8
Daye
1983
Oliver
4
Johnson
1983
Mack Vickery
4 1983
Fabulous Kays
4 *672 In leasing their masters from Music Masters, each petitioner signed a lease agreement. The lease agreements conveyed to petitioners the right to commercially exploit the masters in the United States only for a period of 7-1/2 years. A form entitled "Acknowledgement of Lessee" attached to the lease agreement provided the amount of lease payments required under the deferred payment plan. It also set forth the amount of the investment tax credit to which the lessee was allegedly entitled. An "Election To Pass Investment Tax Credit From Lessor To Lessee" also was attached to the lease agreement. Petitioners did not negotiate any of the terms contained in their leases. In addition to the lease agreements, each petitioner also executed a "Manufacturing and Distribution Agreement" with either Galaxy or Future Sound. The agreements of these two companies were virtually identical. In these documents, the manufacturer/distributor agreed to manufacture recordings and to "augment the individual sales efforts of [petitioners]." In exchange, petitioners agreed to pay a fee. Although the fees varied according to the promotional program (TV/radio or regular) and the number of units leased, *673 generally the fee for a petitioner who leased one unit in the regular program was $ 200. The manufacturing/distribution agreement also provided for the following apportionment of net receipts: 25% -- lessee 45% -- lessor 30% -- manufacturer/distributor Petitioners did not negotiate the terms of the manufacturing/distribution agreements, nor did they consider contracting with distributors other than the two companies suggested by Music Masters. On Schedules C attached to their respective Federal income tax returns, petitioners deducted the rental payments they made to Music Masters for the lease of their masters, and they deducted the distributor fees they paid to either Galaxy or Future Sound. Petitioners also claimed investment tax credits, and in most cases, investment tax credit carrybacks. The claimed investment credits and carrybacks were based on the price Music Masters paid for each master. Although petitioner McDuffie received $ 250 of income from his leasing activity, most petitioners received less than $ 150 of income from sales of recordings produced from their leased masters. Program Operation
Petitioners received quarterly reports from Galaxy and *674 Future Sound. The quarterly reports reveal that there were substantial delays in the manufacture and distribution of recordings produced from the masters. Generally, the manufacture of recordings was not completed until the end of the second quarter, at which point promotional activities were just beginning. By the end of the third quarter, the companies were reporting unprofitable sales efforts. Toward the end of 1984, the distributors began terminating their agreements with petitioners. Although petitioners were advised that these agreements had been terminated, they neither hired another distributor nor undertook to distribute the products themselves. Indeed, petitioners appeared to be unaware of their contractual obligations to distribute the recordings on their own. On November 12, 1985, Music Masters and its president, Alfred Masters, were enjoined from promoting and selling interests in the leasing program. United States v. Music Masters, Ltd., 621 F. Supp. 1046 (W.D.N.C. 1985), affd. without opinion 816 F.2d 674 (4th Cir. 1987). The District Court further ordered Music Masters to send letters to petitioners offering to rescind the lease *675 agreements petitioners entered into with Music Masters. None of petitioners accepted this offer of rescission. OPINION The first issue is whether petitioners are entitled to investment tax credits and investment tax credit carrybacks, as well as deductions for the lease payments and distributor fees they made with respect to their investments in the leasing program. Petitioners bear the burden of proving that they are entitled to the claimed credits and deductions. Rule 142(a). A common threshold for the claimed credits and deductions is the taxpayers must be engaged in an activity for profit. Sec. 183; Soriano v. Commissioner, 90 T.C. 44 (1988). Whether an activity is engaged in for profit depends on whether the activity was undertaken with the objective of making a profit. Jasionowski v. Commissioner, 66 T.C. 312, 319 (1976). Although petitioners need not have a reasonable expectation of making a profit, they must have entered into the activity with an actual and honest profit objective. Dreicer v. Commissioner, 78 T.C. 642, 644-645 (1982), *676 affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). In this context, "profit" means economic profit, independent of tax savings. Seaman v. Commissioner , 84 T.C. 564, 588 (1985); Surloff v. Commissioner, 81 T.C. 210, 233 (1983). In Rose v. Commissioner, 88 T.C. 386 (1987), affd. 868 F.2d 851 (6th Cir. 1989), we adopted an objective test under which transactions involving "generic tax shelters" are disregarded if they are devoid of economic substance. In the case of a generic tax shelter, "the presence or absence of a profit objective is to be determined from the examination of certain objective factors which tend to indicate whether or not the disputed transaction had economic substance." Horn v. Commissioner, 90 T.C. 908, 933 (1988); Rose v. Commissioner, supra at 414. Under the Rose criteria, a "generic tax shelter" possesses some or all of the following characteristics: *677 (1) the materials promoting the program focus on the tax benefits; (2) the investors accepted the agreement without negotiation of price or terms; (3) the assets in question consist of packages of purported rights, difficult to value in the abstract and substantially overvalued in relation to tangible property included as part of the package; (4) the tangible assets were acquired or created at a relatively small cost shortly before the transaction in question; and (5) the bulk of the consideration was deferred by promissory notes, nonrecourse in form or in substance. Rose v. Commissioner, supra at 412. We find petitioners' lease of the masters possesses the characteristics of a generic tax shelter. The promotional material for the leasing program emphasizes the tax benefits of the leasing program. The brochure contains numerous references to the investment tax credit and to various sections of the Internal Revenue Code. Moreover, petitioners apparently were aware that they would receive an investment tax credit which would exceed their required cash investment. Petitioners accepted the price and the terms of their respective leases and manufacturing/distribution *678 agreements without negotiation. Additionally, all of the masters were overvalued; the rights to masters are difficult to value in the abstract, and the actual value of the tangible property involved was minimal. The record established that some of the masters sold by Gold Shield to Music Masters for $ 1,000,000 each were acquired by Gold Shield for $ 2,500 each shortly before the sale to Music Masters. Finally, we note that although there was no long-term indebtedness on the investor level, Music Masters deferred the bulk of the consideration (98 -- 99 percent) which it agreed to pay for the masters, with notes which were to be paid from one-third of the proceeds Music Masters was slated to receive. Petitioners' activities with respect to the masters fall within the definition of a generic tax shelter. Therefore, we apply the unified approach of Rose to determine whether the transaction is devoid of economic substance. The Rose approach evaluates the following factors: (1) the investment activities of petitioners; (2) the relationship between price and fair market value; (3) the *679 structure of the financing; and (4) perceived Congressional intent. 1. Petitioners' Investment Activities
Prior to leasing the masters, petitioners had no expertise in or knowledge of master sound recordings or the leasing of masters. Petitioners did not independently investigate the economics of the leasing activity, nor did they contact someone knowledgeable to study the viability of the program. The few petitioners who sought outside advice confined their questions to the validity and enforceability of the lease agreement, and to the availability of the investment tax credit. Other petitioners checked with the Better Business Bureau. However, no effort was made by any petitioner to confirm the potential profitability of the program. Indeed, most petitioners could not state, even generally, how much income they expected to receive from their leasing activities. None of the petitioners listened to the masters before leasing them. After the program began, petitioners did little more than call Music Masters or its attorney to inquire why there was not greater success. Petitioners undertook no independent distribution effort, despite their contractual obligations. *680 Moreover, once Galaxy and Future Sound terminated the existing distribution agreements, petitioners did not attempt to hire another distributor. 2. Relationship Between Fair Market Value and Price
The price of $ 1,000,000 per master ($ 2,000,000 for double LP masters) bears no relationship to the fair market value of the recordings. We note that Music Masters attempted to inflate the value of several masters by paying Gold Shield 400 times the amount for which that company had just acquired them. However, there is no evidence of any circumstance existing at that time which would have had such an impact on the value of these masters. At trial, petitioners presented no expert testimony and no evidence of the value of these masters. Instead, petitioners argue that the values they claimed for their masters are supported by the sale of the masters between a willing seller (Gold Shield) and a willing buyer (Music Masters). None of the Music Masters appraisers testified at the trial of these cases. Moreover, petitioners presented neither expert witnesses nor other evidence to support the claimed values of the masters. Respondent's expert witness, Thomas Bonetti, testified *681 and submitted appraisals of the masters. Mr. Bonetti evaluated the masters using a potential stream of income approach. He listened to recordings produced from the masters, and analyzed the quality of the production and packaging. He also researched the artist, as well as the material performed, and considered the cost effectiveness of delivering a particular recording to the consumer. Mr. Bonetti found the products manufactured from each of the masters inferior in one or more of the following ways: (1) recording of poor quality; (2) packaging suitable for budget record sales only; (3) material not performed by named artist; (4) identical material widely available on other recordings; (market saturated); (5) inferior production; (6) demonstration recording (not intended for sale to public); and (7) title defect (master not owned by Music Masters). Having identified problems with each of the recordings, Mr. Bonetti established that with the exception of The Embers, the fair market values of the single LP masters ranged between $ 1,000 and $ 5,000. Mr. Bonetti determined that The Embers' double LP master had a value of $ 10,000, noting the master was reasonably well-produced and *682 the group had a strong local following in North Carolina and Virginia. We agree with the appraisals of Mr. Bonetti and have found in the findings of fact the fair market values which he assigned to the masters. The absence of arm's-length negotiations is a key indicator that a transaction lacks economic substance. Rose v. Commissioner, supra at 416; Helba v. Commissioner, 87 T.C. 983, 1005-1007 (1986). No negotiations took place between Music Masters and Gold Shield over the cost of the masters. The price of each master (with the exception of double LP masters) was arbitrarily set at $ 1,000,000. Certainly, Gold Shield was willing to sell these masters for $ 1,000,000 when it had paid only a fraction of that price just shortly before the sale. Indeed, even if we were to consider only the cash down payment Music Masters paid to Gold Shield for each master, Gold Shield still stood to profit handsomely from the transaction. Furthermore, Music Masters was willing to "buy" these masters for $ 1,000,000 (or $ 2,000,000), when in reality it only had to *683 pay one percent or two percent of that price as a cash downpayment. Music Masters was interested in inflating the purchase price so that it could lure investors to the program with a hefty investment tax credit. In sum, because the record indicates a complete lack of arm's-length dealings between Gold Shield and Music Masters, we will not accept the purchase price of these masters as their fair market value. The most convincing evidence of value was provided by respondent's expert witness, Mr. Bonetti. The opinions of expert witnesses are admissible and relevant to the issue of value, but the opinions are weighed according to the experts' qualifications and other relevant evidence. See Johnson v. Commissioner, 85 T.C. 469, 477 (1985). This Court may reject expert testimony if it is judged appropriate to do so. Helvering v. National Grocery Co., 304 U.S. 282 (1938); Chiu v. Commissioner, 84 T.C. 722 (1985). Mr. Bonetti was thorough and professional. His appraisals were performed with care, and we accept the values determined in the *684 appraisals as the fair market values of these masters. Consequently, we find that the fair market values of the masters bear no relationship to the values petitioners claimed for their investment tax credit. 3. Structure of the Financing
A sale financed by deferred debt which in substance or in fact is not likely to be paid is an indicia of lack of economic substance. Rose v. Commissioner, supra at 419. Our analysis must focus on the substance rather than the form of the debt. Waddell v. Commissioner, 86 T.C. 848, 902 (1986), affd. 841 F.2d 264 (9th Cir. 1988). In these cases, Music Masters executed many promissory notes totaling $ 112,963,900 to finance the purchase of the masters from Gold Shield and Hice. Although these notes were stated to be "full-recourse promissory notes," no payment of principal or interest was due for 12 years, except from one-third of the profits Music Masters was to receive from the sale of recordings produced from the masters. The amount of these promissory notes was greatly inflated in relation *685 to the values of the masters. Because these notes were so commercially unreasonable, we do not believe they were ever intended to be repaid. Rather, these notes were used to inflate the value of the masters to increase the amount of the investment tax credit. Although there was no long-term indebtedness at the investor level, the investors did benefit from the inflated valuation when Music Masters elected to pass through the investment tax credit to petitioners. The promissory notes executed by Music Masters to Hice and Gold Shield, therefore, were an integral part of the arrangement between Music Masters and petitioners and indicate lack of economic substance in these cases. [4]
4. Perceived Congressional Intent
We do not believe Congress intended to encourage investment in master recording leasing ventures like the one at issue. See Rose v. Commissioner, supra at 421-422. From our analysis of petitioners' investment activities, the disparity between the claimed values *686 of the masters and their actual fair market values, as well as the underlying financial structure of the leasing program, we find that petitioners' leasing activities were devoid of economic substance and should be disregarded for tax purposes. Therefore, petitioners are not entitled to deductions for the lease payments they made to Music Masters, they are not entitled to deductions for the distributor fees paid to Galaxy and Future Sound, and they are not entitled to their respective claimed investment tax credits and investment tax credit carrybacks. Section 6653(a) Addition to Tax
An addition to tax equal to five percent is imposed if any part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations. Sec. 6653(a)(1).[5] In addition, section 6653(a)(2) imposes an addition to tax in an amount equal to 50 percent of the interest due on the portion of the underpayment attributable to negligence or intentional disregard of rules or regulations. Negligence is the lack of due care or the failure to do what a reasonable and ordinarily prudent person *687 would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners bear the burden of proof on this issue. Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). Petitioners entered into this leasing transaction without any experience in leasing masters and without seeking the advice of anyone who had expertise in the master recording industry. They had not listened to the masters prior to leasing them, and they did not seek the advice of anyone who could assess the program's viability. Petitioners did not even seem aware of their contractual obligations to distribute and promote their masters independent of the efforts of either Galaxy or Future Sound. These facts demonstrate petitioners' failure to exercise the care of a reasonable and prudent person in entering this investment and in claiming the credits and deductions. See Neely v. Commissioner, supra.Accordingly, the additions to tax under section 6653(a) are sustained. Section 6659 Addition to Tax
Respondent determined additions *688 to tax under section 6659 for all petitioners for most of the taxable years at issue. A graduated addition to tax is imposed on individuals whose underpayment of tax equals or exceeds $ 1,000 and is attributable to a valuation overstatement. Sec. 6659. A valuation overstatement exists if the value of any property claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation. Sec. 6659(c)(1). If the valuation claimed exceeds 250 percent of the correct valuation, then the addition to tax is equal to 30 percent of the underpayment, but only to the extent the underpayment is attributable to the valuation overstatement. Section 6659 does not apply to underpayments of tax which are not "attributable to" valuation overstatements. See Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988). Petitioners based their respective investment tax credits on claimed fair market values of either $ 1,000,000 or $ 2,000,000 for each of the masters they leased. This value was equal to the price purportedly *689 paid by Music Masters to Hice or Gold Shield for each master. The actual fair market values of the masters bear no relationship to the values petitioners used in claiming their investment tax credits. We have found the fair market values of the masters to range between $ 1,000 and $ 5,000, and in the case of The Embers, $ 10,000. Thus, the section 6659 valuation overstatement addition to the tax applies. The disallowed investment tax credits and carrybacks created an underpayment attributable to a valuation overstatement. However, the underpayments attributable to the lease payments and to the distributor fees are not subject to the overvaluation addition. Soriano v. Commissioner, 90 T.C. 44, 62 (1988). Petitioners deducted the rental expenses as payments for the use of property, and they deducted the distributor fees as payment for a service. In deducting these expenses, they made no claim as to the value of the underlying property. Soriano v. Commissioner, supra.
Section 6621(c) Addition to Tax
Section 6621(c)(1) imposes an increased *690 rate of interest when there is a "substantial underpayment attributable to tax motivated transactions." For purposes of section 6621(c), an underpayment exceeding $ 1,000 is substantial. The additional interest accrues after December 31, 1984, even if the transaction was entered into prior to the enactment of section 6621(c). Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986). A tax motivated transaction includes any valuation overstatement within the meaning of section 6659(c). Sec. 6621(c)(3)(A)(i). Congress specifically amended section 6621(c)(3)(A) to add to the list of tax-motivated transactions: "(v) any sham or fraudulent transaction." [6] This Court has recently interpreted section 6621(c)(3)(A)(v) to include transactions which were without economic substance. Patin v. Commissioner, 88 T.C. 1086, 1128-1129 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion Patin v. Commissioner, 865 F.2d 1264 (5th Cir. 1989), *691 affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). We have determined that petitioners made a valuation overstatement with respect to that portion of the underpayments attributable to the disallowance of the investment tax credits and investment tax credit carrybacks claimed on their respective returns. We have also determined the transactions at issue were without economic substance and therefore a sham. Accordingly, additional interest will be imposed under section 6621(c). Section 6661 Addition to Tax
Respondent determined that for 1983, petitioner Gilmore was liable for the section 6661 addition to tax for substantial understatement of income tax liability. Section 6661(a) provides for an addition to tax if there is a substantial understatement of income tax. An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. *692 Sec. 6661(b)(1)(A). According to the notice of deficiency, the tax required to be shown on petitioner Gilmore's 1983 return is $ 5,492. Petitioner Gilmore's return showed a tax of -0-, so the $ 5,492 difference in liability is the understatement of tax for 1983. This understatement is substantial for purposes of section 6661 because it exceeds the greater of $ 5,000 or $ 549 (10 percent of the tax required to be shown on the return). Under section 6661(a), the addition to the tax is computed by applying a percentage to the amount of the underpayment of tax attributable to the substantial understatement. In the notice of deficiency, respondent determined that the applicable rate to be applied in this case is 10 percent. Respondent has not asserted that an increased percentage rate should be applied in computing this addition to tax. See Pallottini v. Commissioner, 90 T.C. 498 (1988). Accordingly, we hold for respondent that petitioner Gilmore is liable for the 10 percent addition to the tax pursuant to section 6661(a) for 1983. To reflect the foregoing, *693 Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Thelma B. Brown, docket No. 34904-85; David Reid, III and Gloria J. Reid, docket No. 44871-85; Exter G. Gilmore, Jr. and Olivia G. Gilmore, docket No. 45324-85; Larry T. Suitt and Gwendolyn C. Suitt, docket No. 45438-85; Lee and Veronica B. Johnson, Jr., docket No. 445-86; Lenard Latimer and Ruth M. Latimer, docket No. 3276-86; Wilbert Joseph Hamilton and Geneva A. Hamilton, docket No. 9733-86; Jackie Robinson and Carolyn K. Robinson, docket No. 11311-86; Christine M. Powell, docket No. 19966-86; Jackie Dale McDuffie and Patricia Alford McDuffie, docket No. 22009-86; Alfonzo and Beatrice G. Hamilton, Jr., docket No. 30119-86; Ronald Daye and Bobby Daye, docket Nos. 6548-87 and 35654-87; and Ronald Eric Johnson and Rosetta B. Johnson, docket No. 20782-87.↩
2. Hereinafter, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. 50 percent of the interest due on the underpayment of tax attributable to negligence or intentional disregard of rules or regulations.↩
3. Section 6621(d) was amended and redesignated as section 6621(c)↩ by the Tax Reform Act of 1986, sec. 1151(c)(1), Pub. L. 99-514, 100 Stat. 2744.
4. See Avers v. Commissioner, T.C. Memo. 1988-176; Apperson v. Commissioner, T.C. Memo. 1987-571↩, on appeal (7th Cir., Mar. 9, 1988).
5. For the taxable years 1979 and 1980, this addition to tax is imposed under section 6653(a)↩.
6. Pub. L. 99-514, sec. 1535(a), 100 Stat. 2085, 2750. This amendment is effective with respect to interest accruing after December 31, 1984.↩