C.D. HUNT, Jr., Petitioner–Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

Jackie ROBINSON; Carolyn K. Robinson, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

Christine M. POWELL, Petitioner–Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

Larry T. SUITT; Gwendolyn C. Suitt, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

Wilbert Joseph HAMILTON; Geneva A. Hamilton, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

Alfonzo HAMILTON, Jr.; Beatrice G. Hamilton, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

David REID, III; Gloria J. Reid, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

Lee JOHNSON, Jr.; Veronica B. Johnson, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

Ronald Eric JOHNSON; Rosetta B. Johnson, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

Exter G. GILMORE, Jr.; Olivia G. Gilmore, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

Ronald DAYE; Bobbie Daye, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

Ronald DAYE; Bobbie Daye, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

Thelma B. BROWN,
Petitioner–Appellant,

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent–Appellee.

Nos. 90–1022 to 90–1034.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 6, 1991.

Decided July 1, 1991.

As Amended Aug. 5, 1991.

Henry Donnell Gamble, Durham, N.C., for petitioners-appellants.

David I. Pincus, argued (Shirley D. Peterson, Asst. Atty. Gen., Gary R. Allen, Howard M. Solomon, Laura Conley O'Hanlon, Tax Div., U.S. Depart. of Justice, Washington, D.C., on brief), for respondent-appellee.

Before PHILLIPS and WILKINSON, Circuit Judges, and SMITH, United States District Judge for the Eastern District of Virginia, sitting by designation.

## OPINION

REBECCA BEACH SMITH, District Judge:

Appellants challenge on appeal three aspects of the Tax Court's decision: 1) the finding that appellants did not enter the master recording lease program with a profit motive; 2) the reliance upon certain expert testimony to establish the fair market values of the master sound recordings; and 3) the imposition of additional interest pursuant to section 6621(c) of the Internal Revenue Code ("I.R.C.").[1] For the reasons stated below, we affirm the decision of the Tax Court.

### I.

Alfred Masters and John Olive formed Music Masters, Ltd. ("Music Masters") in March, 1982, for the purpose of purchasing master sound recordings ("master recordings") and then leasing the master recordings to investors. Master recordings are permanent tapes of musical performances used to make records and tapes for mass distribution and sale. During 1982 and 1983, Music Masters purchased approxi- mately 135 master recordings at prices purportedly ranging from $250,000 for a single recording to $2,000,000 for an album. Sales of the master recordings were structured so that Music Masters made only a small cash down payment and paid the balance through a purported recourse promissory note, which typically equaled between ninety-eight and ninety-nine percent of the purchase price. Each promissory note had a life of twelve years and, prior to its due date, the only payment obligation on a note was for Music Masters to pay a percentage of the profits generated from the sale of records. Furthermore, each note was secured only by the master recording for which it was issued and whatever assets Music Masters might have at the end of the twelve-year period.

In 1982, Music Masters began promoting the Master Sound Recording Lease Program ("lease program") by distributing promotional material at seminars and other meetings with potential investors. Each master recording owned by Music Masters was divided into twenty-five leasehold units. Music Masters leased these units to investors for a period of ninety months during which time the lessee was given the right to exploit the master recording commercially. By executing a lease, the lessee committed only to pay the first fifteen months minimum lease payment, which, at the lessee's election, could be paid in cash or by a deferred payment plan. All other future lease payments were to come from a share of the profits earned on the sale of recordings. Upon executing a lease, the lessee also entered into an agreement with a distributor to manufacture and market recordings produced from the master. The lessee chose the distributor from a list provided by Music Masters, and paid the distributor a "start-up" fee ranging from $200 to $800 to cover the start-up costs for distribution.[2]

---

1. The I.R.C. is Title 26 of the United States Code.

2. Although the promotional brochure claimed to reserve for lessees the right to bypass the distributor and design their own marketing programs, in fact, the lessees entered into an agree-

A principal focus of the multi-page promotional brochure was introducing the potential investor to the attendant tax benefits that could be realized by investing in the lease program. In particular, the brochure emphasized that pursuant to I.R.C. § 48(d) lessees were eligible to claim an investment tax credit based on the amount that Music Masters purportedly paid for the master recording. This investment tax credit, the brochure explained, could, if the lessee enjoyed an excess of credit in that tax year, be used as a carryback for a period of three years or used as a carryover for a period up to fifteen years. In addition to the investment tax credit benefits, the brochure informed prospective investors that lessees were entitled to deduct as business expenses under I.R.C. § 162 the lease payments and distribution costs incurred and, furthermore, that a legal assistance fund had been established to assist investors in subsequent litigation with a government agency—the Internal Revenue Service.

Appellants invested in the lease program in 1982 and 1983. In accordance with the promotional brochure, appellants claimed investment tax credits based on the "purchase price" of the master recordings and claimed business deductions for the "start-up" fees and other expenditures. Appellants subsequently were served with notices of deficiency arising from their investment in master recordings, and were assessed various additions to tax under the I.R.C., including sections 6661 (repealed 1989),[3] 6621(c) (repealed 1989), 6653(a) (amended 1989), and 6659 (repealed 1989).[4]

---

ment with one of the distributors recommended by Music Masters.

**3.** Only appellants Exter and Olivia Gilmore were assessed a penalty under I.R.C. § 6661 for substantially understating their income tax liability.

**4.** Appellant C.D. Hunt, Jr., was served with a notice of deficiency and additions to tax for the tax year 1983, arising from a lease agreement with Music Masters by which he acquired a four percent interest in a master recording by "Tammy Faile." *See* Joint App. at 27–29, 188–92, 625–26. Appellants Jackie and Carolyn Robinson were served with a notice of deficiency and additions to tax for the tax years 1979, 1980, and 1982, arising from lease agreements with Music Masters by which they acquired a four percent interest in master recordings by "Gladys Knight and the Pips" and "Sly and the Family Stone." *See id.* at 117–19, 211–16, 526. Appellant Christine Powell was served with a notice of deficiency and additions to tax for the tax years 1979, 1980, 1981, and 1982, arising from a lease agreement with Music Masters by which she acquired an eight percent interest in a master recording by "Gladys Knight and the Pips." *See id.* at 124–32, 217–21, 480. Appellants Larry and Gwendolyn Suitt were served with a notice of deficiency and additions to tax for the tax year 1983, arising from a lease agreement with Music Masters by which they acquired an eight percent interest in a master recording by the "Fabulous Kays." *See id.* at 101–10, 203–06, 604–05. Appellants Wilbert and Geneva Hamilton were served with a notice of deficiency and additions to tax for the tax year 1983, arising from a lease agreement with Music Masters by which they acquired a four percent interest in a master recording by "Warner Mack." *See id.* at 114–16, 207–10, 654–55. Appellants Alfonzo and Beatrice Hamilton were served with a notice of deficiency and additions to tax for the tax years 1980, 1981, and 1983, arising from a lease agreement with Music Masters by which they acquired an eight percent interest in a master recording by "Jimmy Gateley." *See id.* at 133–35, 222–25, 641–42. Appellants David and Gloria Reid were served with a notice of deficiency and additions to tax for the tax years 1980, 1982, and 1983, arising from lease agreements with Music Masters by which they acquired a four percent interest in master recordings by "Sly and the Family Stone" and "Buddy Greco Country." *See id.* at 43–52, 673. Appellants Lee and Veronica Johnson were served with a notice of deficiency and additions to tax for the tax years 1979, 1980, 1981, and 1982, arising from a lease agreement with Music Masters by which they acquired a twelve percent interest in a master recording by "Carl Perkins." *See id.* at 76–87, 422–23. Appellants Ronald and Rosetta Johnson were served with a notice of deficiency and additions to tax for the tax year 1983, arising from lease agreements with Music Masters by which they acquired a four percent interest in master recordings by "Mack Vickery" and the "Fabulous Kays." *See id.* at 151–61, 230–33, 735. Appellants Exter and Olivia Gilmore were served with a notice of deficiency and additions to tax for the tax years 1980 and 1983, arising from a lease agreement with Music Masters by which they acquired an eight percent interest in a master recording by the "Fabulous Kays." *See id.* at 53–63, 88–98, 198–202, 589. Appellants

Appellants, in turn, petitioned the Tax Court for a redetermination of their tax liability.

Appellants' cases were consolidated for trial by the Tax Court on the issues of whether appellants were entitled to the credits and deductions claimed with respect to their investments in master recordings, and whether appellants were liable for the additions to tax asserted against them. Applying the "generic tax shelter" test,[5] the Tax Court found that appellants' investments in master recordings were sham transactions. Accordingly, the Tax Court sustained the Commissioner's deficiency determinations and additions to tax. This appeal followed.

## II.

■■■ The Internal Revenue Service may ignore for tax purposes sham transactions. *Hines v. United States*, 912 F.2d 736, 739 (4th Cir.1990). A sham transaction is one designed to create tax benefits rather than to serve a legitimate business purpose. *Id.* (citing *Frank Lyon Co. v. United States*, 435 U.S. 561, 573, 98 S.Ct.

Ronald and Bobbie Daye were served with notices of deficiency and additions to tax for the tax years 1983 and 1984, arising from a lease agreement with Music Masters by which they acquired a four percent interest in a master recording by "Oliver." *See id.* at 139–47, 165–72, 226–29, 752–53. Appellant Thelma Brown was served with a notice of deficiency and additions to tax for the tax year 1983, arising from lease agreements with Music Masters by which she acquired a four percent interest in master recordings by the "Silver Eagle Band" and "Oliver." *See id.* at 30–32, 40–42, 193–97, 502.

**5.** The Tax Court adopted the "generic tax shelter" test in *Rose v. Commissioner*, 88 T.C. 386 (1987), *aff'd*, 868 F.2d 851 (6th Cir.1989). Under this test, transactions involving "generic tax shelters" are disregarded for tax purposes if the transactions are devoid of economic substance. The Tax Court in *Rose* defined a "generic tax shelter" as a transaction possessing some or all of the following characteristics: 1) promotion by materials that focus on tax benefits; 2) acceptance of price terms by investors without negotiation; 3) assets consisting of packages of purported rights that are difficult to value in the abstract and overvalued in relation to the tangible property included as part of the package; 4) tangible assets that were acquired or created at a relatively small cost shortly before the transaction in question; and 5) the deferring of the

1291, 1298, 55 L.Ed.2d 550 (1978)). This circuit has adopted a two-pronged test for analyzing whether a transaction is a sham:

> To treat a transaction as a sham, the court must find that the taxpayer was motivated by no business purposes other than obtaining tax benefits in entering the transaction, and that the transaction has no economic substance because no reasonable possibility of a profit exists.

*Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89, 91 (4th Cir.1985) (citing *Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. 184, 209 (1983)). The purpose of this test is to ascertain both the subjective motivations of the taxpayer and the objective reasonableness of the investment to determine whether the transaction contained economic substance aside from the tax benefits. *Hines*, 912 F.2d at 739.

■■■ As stated earlier, the Tax Court applied the "generic tax shelter" test to analyze appellants' investment activities. Although this test, in form, is not identical to the two-pronged test employed by this court since *Rice's Toyota*, both tests are

bulk of consideration by promissory notes, nonrecourse in form or substance. 88 T.C. at 412. Whether a transaction involving a "generic tax shelter" is devoid of economic substance under this test is to be determined by evaluating the following factors: 1) the investment activities of the taxpayers; 2) the relationship between the asset's price and fair market value; 3) the structure of the financing; and 4) the perceived congressional intent. *Id.* at 415–22.

Although the Tax Court in *Rose* attempted to set forth a "unified" approach, the Sixth Circuit, while affirming the decision of the Tax Court, declined to adopt the "generic tax shelter" test. According to the Sixth Circuit, "Whether characterized as a 'generic tax shelter' test or a two-prong subjective/objective analysis, the essential inquiry is whether the transaction had any practicable economic effect other than the creation of economic tax losses." 868 F.2d at 854. In other words, the Sixth Circuit found that the "generic tax shelter" test was consistent with, but offered nothing in addition to, the analysis traditionally applied to determine whether a transaction is a "sham." Both tests require the court to examine the taxpayer's profit motive and the economic substance of the venture. Likewise, we see no need to adopt the "generic tax shelter" test, since this circuit's two-pronged test accomplishes the same purpose. *See infra* at 473–474.

premised on considering the relevant facts and circumstances to determine the presence or absence of a profit motive and to evaluate the economic substance of the venture at issue.[6] Accordingly, the Tax Court's findings in applying the "generic tax shelter" test support a holding that, under the *Rice's Toyota* test, appellants' leasing activities constituted sham transactions.

■ The first prong of the *Rice's Toyota* test—the business purpose inquiry—concerns the motives of the taxpayer in entering the transaction in question. 752 F.2d at 92. The Tax Court in the present case determined appellants' subjective motive by examining the objective evidence before it. *See Hunt v. Commissioner,* 58 T.C.M. (CCH) 965, 970-72 (1989). It is proper to draw from objective facts inferences regarding a subjective intent to profit. *Friedman v. Commissioner,* 869 F.2d 785, 792 (4th Cir.1989); *Faulconer v. Commissioner,* 748 F.2d 890, 894 (4th Cir.1984).

■ The objective evidence contained in the record supports the Tax Court's conclusion that appellants did not engage in the leasing activities with a profit motive. Of particular significance in determining intent in this case is the focus of the promotional material distributed to prospective investors.[7] *See Friedman,* 869 F.2d at 793. As the Tax Court recognized, the obvious focus of the promotional brochure distributed to appellants was on the tax benefits of the lease program. *See Hunt,* 58 T.C.M. (CCH) at 971.

■ The second prong of the *Rice's Toyota* test to determine a sham transaction is the economic substance inquiry. 752 F.2d at 94. Based on appellants' investment activities in the lease program at issue, both prior to and after the investment; the disparity between the prices of the master recordings and their actual fair market values; and the underlying financial structure of the leasing program, the Tax Court found that appellants' leasing activities lacked economic substance. *Hunt,* 58 T.C.M. (CCH) at 972.[8] Aside from the tax benefits, the lease program afforded appellants no reasonable possibility for profit. This finding is supported adequately by the record.

In summary, the Tax Court's findings that appellants' investments in master recordings were without a profit motive, were devoid of economic substance, and, therefore, were sham transactions, are ones of fact and are reviewable under the clearly erroneous standard. *See, e.g., Antonides v. Commissioner,* 893 F.2d 656 (4th Cir.1990) (reviewing under clearly erroneous standard the Tax Court's decision that taxpayers did not engage in venture with a profit motive); *Rice's Toyota,* 752 F.2d at 92. These findings are not clearly erroneous based on the record before this court. The test of *Rice's Toyota* is satisfied, and we affirm the Tax Court's conclusion that appellants' leasing activities constituted sham transactions.

---

**6.** *See supra* note 5 for discussion of the "generic tax shelter" test.

**7.** We do not mean to imply that the other factors considered by the Tax Court are insignificant. To the contrary, the Tax Court, in applying the "generic tax shelter" test, analyzed the same types of objective indicia held significant by this court on prior occasions in determining profit motive, such as the absence of negotiation on the part of appellants with respect to the terms of their leases and distribution agreements; the overvaluation of the master recordings and the conveyance of purported rights that were difficult to value in the abstract; and the fact that virtually all of the consideration "paid" by Music Masters to acquire the master recordings was deferred and to be paid only from proceeds realized from the sale of recordings. *Hunt,* 58 T.C.M. (CCH) at 970-71.

**8.** Specifically, the Tax Court found: (1) prior to leasing the master recordings at issue, appellants possessed no knowledge of master recordings or the leasing thereof, and after executing their leases they exerted little or no effort to enhance the profitability of their investments; (2) the prices of the master recordings bore no relationship to their fair market values; (3) the sale of the master recordings to Music Masters was financed principally by deferred debt so commercially unreasonable that there was little likelihood of repayment; and (4) it was unlikely that Congress intended to encourage investment in master recording leasing ventures such as the ones at issue. *Hunt,* 58 T.C.M. (CCH) at 971-72.

## III.

Appellants object to the Tax Court's acceptance of and reliance on Thomas L. Bonetti's expert testimony and appraisals in determining the fair market values of the master recordings at issue. Instead, appellants argue that the Tax Court was compelled to assign as the fair market values the prices purportedly paid by Music Masters.[9] Notwithstanding appellants' objections, we find no error.

As discussed above, the relationship between fair market value and price was a factor considered by the Tax Court in making its findings. Bonetti appraised a number of the master recordings in question, which had been "purchased" by Music Masters for $1,000,000 to $2,000,000, as having market values of between less than $1,000 to less than $10,000. The Tax Court found Bonetti's testimony to be convincing and accepted the values determined in his appraisals as the fair market values of the masters in question. We reject appellants' objections to Bonetti's testimony and ap-

praisals, because the admission of such comports with Rule 143 of the Rules of Practice and Procedure of the United States Tax Court,[10] and because the Tax Court was free to give Bonetti's testimony and appraisals the weight it felt appropriate.[11]

## IV.

Appellants challenge the Tax Court's imposition of an increased rate of interest pursuant to I.R.C. § 6621(c), which mandates interest of 120 percent of the normal underpayment rate for "any substantial underpayment attributable to tax motivated transactions."[12] A "substantial underpayment" is an underpayment of taxes exceeding $1,000. I.R.C. § 6621(c)(2). Section 6621(c)(3)(A) lists certain transactions that are "tax motivated" within the meaning of section 6621(c), including any valuation overstatement as defined by section 6659(c),[13] and any sham transaction.[14] The increased rate of interest provided by

9. The Tax Court rejected the purchase prices of the master recordings at issue as their fair market values, because appellants offered no evidence, expert or otherwise, to support these claimed values, and because the purchase prices served no purpose other than to inflate the tax savings of the investments. *Hunt,* 58 T.C.M. (CCH) at 971.

10. Rule 143 governs the introduction of evidence in trials before the Tax Court. Subpart (f) of Rule 143 sets forth the particular conditions for admission of expert testimony.

11. Further, we note that appellants' specific objections to Bonetti's testimony and appraisals are without merit and are belied by the evidence. First, there clearly was no error in the Tax Court accepting Bonetti as an expert on the value of master recordings. As Bonetti revealed to the Tax Court, his qualifications included preparing for the Internal Revenue Service and others over 600 written appraisals since 1980, and making numerous prior court appearances as an expert witness. Second, appellants' assertion that Bonetti used no methodology to make his appraisals is contradicted by Bonetti's outline that accompanied his appraisals in which Bonetti explained "the general methodology" he used in making his valuations. Third, to the extent that appellants' objections center around Bonetti's not having listened to the original master recordings themselves, but to commercial copies, Bonetti readily admitted this fact and

explained that he took into account the appropriate "generational losses."

12. Section 6621(c) was repealed by Congress on December 19, 1989, effective for returns having due dates after December 31, 1989. *See* Omnibus Budget Reconciliation Act of 1989, Pub.L. No. 101–239, § 7721, 103 Stat. 2399 (1989). Prior to the Tax Reform Act of 1986, section 6621(c) was codified as section 6621(d). *See* Pub.L. No. 99–514, § 1511(c), 100 Stat. 2744 (1986) (redesignating section 6621(d) as section 6621(c), effective for determining interest for periods after December 31, 1986).

13. For purposes of section 6659(c), which also was repealed on December 19, 1989, *see supra* note 12, a valuation overstatement is one equaling or exceeding 150 percent.

14. The Tax Reform Act of 1986 added "any sham or fraudulent transaction" to the list of "tax motivated transactions" provided in section 6621(c)(3)(A). *See* Pub.L. No. 99–514, § 1535(a), 100 Stat. 2750 (1986). The increased rate of interest provided by section 6621(c) applies retroactively to sham or fraudulent transactions, so long as no final court decision with respect to such was entered prior to October 22, 1986, the date the Tax Reform Act of 1986 was enacted. *See DeMartino v. Commissioner,* 862 F.2d 400, 408–09 (2d Cir.1988).

section 6621(c) is effective as to interest accruing after December 31, 1984. *See* Tax Reform Act of 1984, Pub.L. No. 98–369, § 144, 98 Stat. 682–84 (1984). The Tax Court found the imposition of additional interest proper pursuant to section 6621(c), because appellants made valuation overstatements within the meaning of section 6659(c) and engaged in leasing activities that were void of economic substance and, thus, were sham transactions. *Hunt*, 58 T.C.M. (CCH) at 973–74.

] We find no error in the Tax Court's imposition of additional interest as provided by section 6621(c). Appellants made substantial underpayments attributable to tax motivated transactions. Appellants do not seriously challenge this conclusion. Instead, appellants argue that they should not be charged interest pursuant to section 6621(c) for the period between May 2, 1988, the date of their trial before the Tax Court, and February 12, 1990, the date the Tax Court's decisions were entered pursuant to its opinion of December 18, 1989. According to appellants, the Tax Court purposefully delayed entering its decisions until after Alfred Masters had been tried.[15] We reject this argument. Moreover, appellants were free to stop the running of interest under section 6621(c) before the Tax Court entered its decision on February 12, 1990, by making a remittance for their tax liability and the then-accrued interest. *See* Temp.Treas.Reg. § 301.6621–2T, Q & A No. 11 (1988).

 Appellants also argue "that since the Tax Court denied any of the tax credit there is no under valuation and the Section 6621(c) taxes do not apply." Brief of Appellants at 7 (Sept. 27, 1990). Appellants apparently are trying to articulate that the Tax Court's decision removed any tax motivated underpayment which may have previously existed, such that the predicate for section 6621(c) interest no longer exists. This position is meritless. By definition, a tax motivated underpayment is the portion of a "deficiency," as defined by I.R.C. § 6211, attributable to a tax motivated transaction. Temp.Treas.Reg. § 301.6621–2T, Q & A No. 2 (1991). Section 6211(a), in turn, defines deficiency as the amount by which the tax imposed exceeds the amount shown by the taxpayer on his or her return. Consequently, section 6621(c) interest is imposed on the basis of a taxpayer's filed return, not on the basis of any subsequent action taken by the Tax Court disallowing the claimed credit or deduction.

For the foregoing reasons, the decision of the Tax Court is

AFFIRMED.

---

15. Alfred Masters, co-founder and president of Music Masters, *see supra* at 471, was convicted on December 13, 1989, after an eight-day jury trial for his participation in a conspiracy to promote bogus tax shelters. *See United States v. Masters*, 730 F.Supp. 686 (W.D.N.C.1990). John Olive, the other co-founder, *see supra* at 471, also was convicted for his participation in this scheme, and the convictions for both of these individuals were affirmed by this court. *United States v. Masters*, 923 F.2d 849 (4th Cir.1991).