869 F.2d 785
 63 A.F.T.R.2d 89-830, 89-1 USTC P 9198
 Sheldon E. FRIEDMAN; Debby B. Friedman; Zell C. Hurwitz;
Myrna Hurwitz; Alvin Akman; Marion Akman;
Leonard Gilmor; Sandra Gilmor; Morton
M. Perry; Dorothy G. Perry,
Petitioners-Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.
 No. 87-1154.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 6, 1988.
Decided March 3, 1989.
 
 Martin M. Ruken (Stuart D. Kenney, Vedder, Price, Kaufman & Kammholz, Kenneth C. Shepro, Altheimer & Gray, Chicago, Ill., on brief), for petitioners-appellants.
 Kenneth L. Greene, Washington, D.C. (William S. Rose, Jr., Asst. Atty. Gen., Gary R. Allen, Richard Farber, Tax Div., Dept. of Justice, Washington, D.C., on brief), for respondent-appellee.
 Before WIDENER, PHILLIPS, and ERVIN, Circuit Judges.
 ERVIN, Circuit Judge:
 
 
 1
 The appellants herein all claimed ordinary loss deductions on their 1976 income tax returns as a result of losses incurred in London options transactions. The Commissioner challenged these deductions, and assessed deficiencies against each of the appellants for the 1976 tax year. The Tax Court found in favor of the Commissioner. We affirm the decisions of the Tax Court.
 
 I.
 
 2
 The instant case is one of several appeals taken from decisions entered pursuant to the United States Tax Court's opinion in Glass v. Commissioner, 87 T.C. 1087 (1987). Appeals were filed in ten of the country's thirteen federal judicial circuits. Glass involved the largest single consolidation of cases in the history of the Tax Court, with petitioners at one time numbering over 1,400. The Glass petitioners all claimed ordinary loss deductions on their income tax returns as a result of "London options transactions."
 
 
 3
 The options trading strategies at issue in this appeal resulted from a series of IRS letter rulings which reaffirmed two basic federal tax principles. "First, a person who bought an option held that underlying commodity as a capital asset. Accordingly, any loss or gain on a bought option would be treated as capital. Second, one who sold or granted an option did not own the underlying commodity. Any gain or loss as a sold option would therefore be treated as ordinary." Glass, 87 T.C. at 1153. These rulings, known as the Zinn rulings, spawned a substantial offshore cottage industry in commodity tax straddles.
 
 
 4
 The rulings resulted at least in part from Sec. 1234 of the Internal Revenue Code as it read prior to September 2, 1976:
 
 
 5
 SEC. 1234. OPTIONS TO BUY OR SELL.
 
 
 6
 (a) TREATMENT OF GAIN OR LOSS--Gain or loss attributable to the sale or exchange of, or loss attributable to failure to exercise, a privilege or option to buy or sell property shall be considered gain or loss from the sale or exchange of property which has the same character as the property to which the option or privilege relates has in the hands of the taxpayer or would have in the hands of the taxpayer if acquired by him.
 
 
 7
 * * *
 
 
 8
 (c) SPECIAL RULE FOR GRANTORS OF STRADDLES.--
 
 
 9
 (1) GAIN ON LAPSE.--In the case of gain on lapse of an option granted by the taxpayer as part of a straddle, the gain shall be deemed to be gain from the sale or exchange of a capital asset held for not more than 6 months on the day that the option expired.
 
 
 10
 26 U.S.C. Sec. 1234 (1976). Thus Sec. 1234(c)(1) as in effect prior to September, 1976, only addressed the character of the gain realized on the lapse of an option which had been granted as part of a straddle. The statute did not address the character of the gain or loss realized on a closing transaction entered into with respect to a granted option prior to the lapse of that option.
 
 
 11
 In response to the Zinn rulings, Congress amended Sec. 1234. The statute now provides that gain or loss from a closing transaction is to be treated as short term capital gain or loss. This amendment was only prospective in application, and the taxpayers here are all disputing the amount of tax owed for the 1976 year.
 
 
 12
 All the London options trades were executed on the London Metal Exchange (LME), a commodity exchange on which cash, future, and option contracts in silver, copper, zinc, tin and lead are all traded. There is no governmental regulation of the LME and, unlike its American counterparts, the LME does not operate as a clearinghouse for trades. Rather, all transactions are executed on a principal to principal basis. Thus, a taxpayer who purchased an option or futures contract through a broker/dealer was, in effect, actually purchasing that contract directly from the broker/dealer. Conversely the broker/dealers were the purchasers of all contracts sold by taxpayers executing transactions on the LME.
 
 
 13
 Because the LME operates as a principal's market, broker/dealers are legally obligated to fulfill their part of any contract entered into with either another broker or a client. For this reason a broker/dealer will normally "lay off" her trades--i.e., will enter into an offsetting contract with a third party. Although the LME does not require broker/dealers to lay off trades, one who fails to do so is said to be "running a position" (taking a risk) in the market.
 
 
 14
 No limits exist on price changes for metals traded on the LME. Prices are free to fluctuate on the exchange as market conditions dictate.
 
 
 15
 The traditional LME option is known as a "market option." The strike price[1] of a market option is usually equal to the current forward trading price of the underlying metal. These options are normally traded for a specific delivery date falling 1, 3, 6, 9 or 12 months from the day the option contract is made. Market options are very difficult to "close out" by entering into an offsetting contract for two reasons: (1) the usual practice of setting the strike price at the current market price at the time the option is granted; and (2) the relatively rigid setting of declaration dates[2] usually involved in market options.
 
 
 16
 Because of this lack of flexibility all of the options traded by the taxpayers in this case were "traded" or "dealer" options. With dealer options the price is not tied to the current trading price of the underlying metal. The contracting parties are free to use their discretion to set both delivery and declaration dates and the strike price. Any difference between the strike price and the market price of the underlying commodity, however, is usually reflected in the premium paid or received by the holder or grantor of the option.
 
 
 17
 All of the taxpayers involved in this appeal traded through Rothmetal Trading, Ltd. (Rothmetal), one of the six major offshore broker/dealers who executed these types of transactions. Rothmetal's promotional materials explained to prospective clients exactly what an option is, and why the transactions in question had to take place on the LME in order to achieve the desired tax consequences. Those materials provided:
 
 
 18
 A "call" is an option to buy property such as real estate, securities or commodity future contracts. A "put" is the opposite, an option to sell. The most common example of a call option is the real estate option to buy property. All options contracts include a span of time for which the offer is held open, an offering price for the property itself (called the striking price) and a cost for buying the option (called the option premium). For example, if you owned a piece of real estate, you could write an option against the underlying property for say, $100,000 that is good for the next six months. Anyone desiring to tie up this property at $100,000 offering price for six months would buy this option from you for say $1,000 (the option premium).
 
 
 19
 One of three things can then happen to the option (a) The option is exercised if the option holder buys the property within six months for $100,000 (b) The option is not exercised within the six months and expires (c) Prior to the six month expiration, the option is sold to another party. In our transactions for taxes (a) and (b) never occur since the "sold" options are always bought back in a closing transaction prior to expiration or exercise.
 
 
 20
 The preceding example can similarly be applied in the securities and commodities markets. We have chosen the commodities markets on the London Bullion Markets for tax transactions because of the following reasons (a) Real estate does not work because of little liquidity, little market movement and no real "put" options available (b) The stock market options in the U.S. are not feasible because of no "put" options available, large fluctuations in spreads resulting in high risk, too little leverage available (i.e. it's ridiculous to buy $2,000,000 of IBM stock to create a $100,000 loss) and commission costs are exorbitantly high (c) The U.S. commodities markets do not have puts and calls available which are what the IRS rulings are based on.
 
 
 21
 The only alternative is to use the largest foreign market exchange in the world, the London Bullion Market, because all of the tools that are needed are available at minimum risk. Here the tax client is insured [sic] that all transactions made are registered (cleared) trades through the Bullion Market with detailed records checked monthly by the Bank of England. He is also quoted a firm but low price for effecting these trades (no more than 15%) [sic] of the amount to be converted).
 
 
 22
 A typical London options transaction involved a two year (or more) series of commodity straddles and employed either an "option straddle" or an "option hedge" trading strategy. With the option hedge trading strategy used by Rothmetal the sale of a call and/or a put option was hedged by the purchase and/or sale of a forward contract.[3] Such a contract may be closed out prior to the delivery date by entering into an offsetting contract with identical terms. The option position would then be closed out at a net loss through the purchase of an identical offsetting call and/or put option. This loss would be reported as ordinary loss during the first year.
 
 
 23
 Simultaneously with the purchase of the closing option position a forward contract would be executed to "hedge" the previously purchased and/or sold forward contract, thereby forming a forward contract straddle. In the following year the forward contract straddle was closed out at a gain approximately equal to the loss incurred on the sold option. The taxpayers reported this gain as either long or short term capital gain. If short term gain resulted, many taxpayers would engage in a "rollover" transaction in order to convert that gain into long term capital gain.
 
 
 24
 Rothmetal summed up the above strategy for its prospective clients by stating:
 
 
 25
 When done properly, this method of investment minimizes the risks inherent in the market place because the tax-spreader always takes both sides of the market at the same time. That is, he simultaneously buys a long position (betting on the commodity investment to go up) and sells a short position (betting on the same commodity to go down). It is easily seen that it doesn't matter whether the commodity goes up or down, since always one side of the spread gains money while the other side loses an equivalent amount of money. The tax spread takes advantage of this by liquidating the loss side of the spread in the present tax year while holding and hedging the equivalent unrealized gain until the succeeding tax year. This allows the taxpayer to deduct these losses against gains in the present year and thus defer the taxes until the following year. Everything discussed so far is common knowledge and has been used successfully for many years, but only in the area of capital gains.
 
 
 26
 As the Glass court noted: "[t]he net annual objective [of these transactions] was the realization of ordinary loss in year one and the deferral of capital gain, short-term or long-term, to year two. While the tax losses anticipated were very substantial, the economic gains, if any, and losses were, by comparison, very small." 87 T.C. at 1157.
 
 II.
 
 27
 The Tax Court held that Sec. 108 of the Tax Reform Act of 1984[4] which governs the deductibility of losses resulting from the disposition of a straddle leg, requires that the transaction at issue must have been primarily motivated by profit. The court then found that none of the Glass petitioners had been motivated to engage in the transactions by the prospect of economic profit. 87 T.C. at 1164. The Glass court disallowed the deductions at issue, however, on the ground that because these transactions lacked a business or economic purpose, they constituted economic shams in substance. Id. at 1176.
 
 
 28
 Appellants argue that the transactions in question do not constitute economic shams, because they were not entered into for the "sole purpose of tax avoidance." They further argue that in determining deductibility under Sec. 108, the appropriate test is whether the strategy as a whole had an "objectively reasonable prospect of profit." The London options transactions, they claim, did present such a prospect. Finally, appellants assert that even if Sec. 108 requires a subjective, primary motive to profit, their cases must be remanded because no basis exists in the record for determining their individual subjective intent.
 
 
 29
 The Commissioner argues that we should affirm the findings of the Tax Court, and disallow the deductions for the reasons set forth in Glass.
 
 III.
 Section 108
 
 30
 The Commissioner's decision to challenge the deductibility of losses incurred in London option transactions resulted in an overwhelming amount of litigation. In an attempt to help the courts with the backlog of these option straddle cases, Congress passed Sec. 108 of the Tax Reform Act of 1984. As originally enacted Sec. 108(a) provided that a loss from the disposition of a straddle position was deductible "if such position is part of a transaction entered into for profit." The phrase "transaction entered into for profit" mirrored exactly the language of Sec. 165(c)(2) of the Internal Revenue Code (I.R.C.).[5] Section 165(c)(2) allows deductions for "losses incurred in any transaction entered into for profit, though not connected with a trade or business." The courts have repeatedly interpreted the phrase "transaction entered into for profit", as it is used in Sec. 165(c)(2), as requiring that the taxpayer's primary motive in entering into the transaction be to make a profit. See, e.g. Helvering v. National Grocery Co., 304 U.S. 282, 289 n. 5, 58 S.Ct. 932, 936 n. 5, 82 L.Ed. 1346 (1938); Early v. Atkinson, 175 F.2d 118, 122 (4th Cir.1949)[6].
 
 
 31
 The Tax Court's first opportunity to apply Sec. 108 came in Miller v. Commissioner, 84 T.C. 827 (1985). The government argued that the phrase "transaction entered into for profit" used in Sec. 108 was unambiguous, and therefore no interpretation was necessary. The Commissioner claimed that by employing the previously interpreted language of Sec. 165(c)(2) Congress intended an identical interpretation for the words of Sec. 108. A bitterly divided tax court rejected this argument, however, and stated that the language of Sec. 108 was "sufficiently ambiguous to warrant [a] search for interpretative assistance." 84 T.C. at 838. The Tax Court turned to the legislative history of Sec. 108 for this assistance. Relying heavily on the Conference Committee Report accompanying the statute, the court concluded that the phrase "transaction entered into for profit," as used in Sec. 108, allowed deductions for loss when the taxpayer merely had a "reasonable expectation of profit." Section 108 did not require that profit have been the primary motive of the transaction. 84 T.C. at 841. Thus, despite the fact that the Miller court found the taxpayers' primary, if not sole, motivation in entering the options transactions in question was tax avoidance, the court allowed the loss deductions incurred on those transactions.
 
 
 32
 The Tax Court's decision in Miller was subsequently reversed. Miller v. Commissioner, 836 F.2d 1274 (10th Cir.1988). The Tenth Circuit held that Sec. 108 did, in fact, incorporate the "primarily for profit" standard of Sec. 165(c)(2). "The language of the statute must be the primary source of any interpretation and, when that language is not ambiguous, it is conclusive 'absent a clearly expressed legislative intent to the contrary.' ... A statute which adopts an expression which has received a long and consistent judicial interpretation in similar contexts is not a likely candidate for ambiguity." 836 F.2d at 1283 (citations omitted). This reversal of Miller came after the Tax Court had decided Glass.
 
 
 33
 Prior to the reversal of the Miller decision, however, and in direct response to that decision, Congress amended Sec. 108(a) by enacting Sec. 1808(d) of the Tax Reform Act of 1986, Pub.L. No. 99-514, Sec. 1808(d), 100 Stat. 2085, 2816 (1986). Section 1808(d) struck the portion of Sec. 108 which read "if such a position is part of a transaction entered into for profit," and inserted in lieu thereof "if such a loss is incurred in a transaction entered into for profit though not connected with a trade or business." The language of Sec. 108(a) as amended, then, is the exact same language of Sec. 165(c)(2).
 
 
 34
 After extensively reviewing the legislative history of this amendment, the Glass court concluded that Congress intended the deductibility of straddle losses to be determined by a "primarily for profit" standard. 87 T.C. at 1167. We agree with this conclusion.
 
 
 35
 The amendment to Sec. 108 originated in the House version of the bill that became the Tax Reform Act of 1986. In the accompanying report the House Ways & Means Committee stated:
 
 
 36
 Section 108 also restated the general rule that losses from the disposition of a position in a straddle are only allowable if such position was part of a transaction entered into for profit. A majority of the United States Tax Court in Miller interpreted section 108 as providing a new, less stringent profit standard for losses incurred with respect to pre-1982 commodity straddles. It was not the intent of Congress in enacting section 108 to change the profit-motive standard of section 165(c)(2) or to enact a new profit motive standard for commodity straddle activities. This technical correction is necessary to end any additional uncertainty created by the Miller case.
 
 
 37
 H.R.Rep. No. 99-426, 99th Cong., 1st Sess. at 911.
 
 
 38
 The Senate did not include this "technical correction" to Sec. 108 in its version of the bill. This correction, however, as proposed by the House, was included, without change, in the final version of the bill as agreed to by the Conference Committee. The Conference Committee Report, without addressing expressly the Sec. 108(a) changes, states that the "Conference Agreement follows the House bill." H.R.Rep. No. 99-841, 99th Cong., 2d Sess. at 845. Thus, both the language and the legislative history of the amendment make clear that Congress intended Sec. 108 to embody the "primarily for profit" standard of Sec. 165(c)(2).
 
 
 39
 Appellants offer two arguments in support of their assertion that Congress intended to retain the "reasonable expectation of profit" standard articulated by the Tax Court in Miller. First, appellants point to a colloquy concerning Sec. 1808(d), which took place on the Senate floor between Senators Dole and Packwood. The senators expressed the view that "the Conference Report did not include the language of the House Report that discussed investors and that the Conference Report is the entire agreement of the Conferees." 132 Cong.Rec. Sec. 13956 (daily ed. Sept. 27, 1986). There is no indication, however, that this colloquy reflected the views of the Senate rather than simply the views of those two senators. We agree with the Commissioner's assertion that "[v]iews of individual members of Congress neither constitute legislative history, nor represent the will of Congress." Brief of Commissioner at 48 n. 48, citing Regan v. Wald, 468 U.S. 222, 237, 104 S.Ct. 3026, 3035, 82 L.Ed.2d 171 (1984); Chrysler Corp. v. Brown, 441 U.S. 281, 311, 99 S.Ct. 1705, 1722, 60 L.Ed.2d 208 (1979). Furthermore, Representative Rostenkowski later refuted Senators Dole and Packwood's interpretation of the amendment, claiming that the legislative history included the House Report. 132 Cong.Rec. E3389, E3391 (daily ed. Oct. 2, 1986).
 
 
 40
 We conclude, as the Ninth Circuit recently did, that "[d]espite these contradictory statements, ... on balance the legislative history of the 1986 amendments strongly indicate that Congress intended to clarify that Sec. 108 incorporates the 'primarily for profit test.' " Landreth v. Commissioner, 845 F.2d 828, 833 at n. 9 (9th Cir.1988). The language of the House Report, in conjunction with the fact that Congress specifically amended Sec. 108 to contain the oft-interpreted words of Sec. 165(c)(2), fully supports this conclusion.
 
 
 41
 Appellants also rely on Wehrly v. United States, 808 F.2d 1311 (9th Cir.1986). Following the Tax Court's rationale in Miller, the Wehrly court found that the 1984 version of Sec. 108 "requires the investor to have only a reasonable expectation of profit." 808 F.2d at 1312. Appellants' reliance on Wehrly is unjustified, however, because the Ninth Circuit recently ruled that Sec. 108, as amended, incorporates the "primarily for profit" standard of Sec. 165(c)(2). Landreth v. Commissioner, 859 F.2d 643 (9th Cir.1988) (on petition for rehearing).[7]
 
 IV.
 Sham in Substance Doctrine
 
 42
 We not only agree with the Tax Court's holding with respect to the deductibility test of Sec. 108, we also agree that Sec. 108 is inapplicable to this case because the transactions at issue constitute economic shams. See Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935) (holding that losses incurred on sham transactions are not deductible under the I.R.C.).
 
 
 43
 With respect to the facts found by the Tax Court, the standard of review is that of clear error. See Boyter v. Commissioner, 668 F.2d 1382, 1388 (4th Cir.1981). Appellants, however, do not appear to challenge the findings of fact made below. And indeed, all of these findings are fully supported by the record. The taxpayers do contest, however, the Tax Court's conclusion that the London options transactions are economic shams.
 
 
 44
 A "sham" transaction is one that has no economic effect other than the creation of tax losses. Bridges v. Commissioner, 325 F.2d 180, 183-85 (4th Cir.1963). In Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89 (4th Cir.1985) this court articulated a two-part test for determining when a transaction constitutes an economic sham. "To treat a transaction as a sham the court must find that the taxpayer was motivated by no business purpose other than obtaining tax benefits in entering the transaction, and that the transaction has no economic substance because no reasonable possibility of profit exists." 752 F.2d at 91. Although the Tax Court did not apply this exact test, its findings support a holding that, under the Rice's Toyota test, the London options transactions constituted economic shams.
 
 
 45
 The first prong of this test, "the business purpose" prong, concerns the subjective intent of the taxpayer, and is similar to the "primarily for profit" standard of Secs. 165 and 108. "The business purpose inquiry simply concerns the motives of the taxpayer in entering the transaction." 752 F.2d at 92. Unlike Secs. 108 and 165, however, this prong requires a showing that the only purpose for entering into the transaction was the tax consequences. The Tax Court found such a singleness of purpose here, stating, "there was no business or profit-making purpose behind the sold option closing transactions above and beyond tax deductions." 87 T.C. at 1176. The Tax Court's findings, substantiated by the record, provide ample support for this conclusion.
 
 
 46
 Appellants argue that the Tax Court could not properly draw conclusions concerning their individual subjective intent, because the court neither heard their profit motive testimony, nor made detailed findings regarding their specific transactions. They therefore urge us to remand this case to the Tax Court for further proceedings on the question of each taxpayer's individual motives. We hold, however, that the Tax Court's findings with respect to the subjective intent of the taxpayers are correct.
 
 
 47
 Given the large numbers of petitioners before the Tax Court in Glass, the court elected to analyze the transactions at issue by examining in depth the trades engaged in by one client of each of the six major broker/dealers. These "majors" were the broker/dealers through whom the vast majority of trades were executed. A "typical" Rothmetal transaction was examined closely by the court. Nowhere do appellants contend that their transactions differed from the trades engaged in for that representative Rothmetal petitioner. In addition to analyzing these representative transactions, the Tax Court also took the profit-motive testimony of five petitioners. See Appellant's Brief at 45.
 
 
 48
 The Tax Court based its findings about the subjective intent of all petitioners upon the objective evidence before it. This evidence included evidence of appellants' individual trades. Joint Appendix, Volume II at 417.[8] Under applicable Fourth Circuit law, it is proper to draw from objective facts inferences regarding a subjective intent to profit. See Faulconer v. Commissioner, 748 F.2d 890, 294 (4th Cir.1984)[9] ("The ultimate determination of whether an activity is engaged in for profit is to be made ... by reference to objective standards, taking into account all of the facts and circumstances of each case. A taxpayer's mere statement of intent is given less weight than objective facts.") Thomas v. Commissioner, 792 F.2d 1256, 1260 (4th Cir.1986)[10] ("Indeed, whether profit was the primary objective of the venture must be determined on the basis of all the facts and circumstances."). Furthermore, in making its determination of subjective intent, the Glass court relied on the same types of objective indicia as this court has when making similar determinations.
 
 
 49
 Of significance to the determination of intent in this case are the promotional materials distributed by each of the broker/dealers to prospective clients. All of these materials make clear that the London options transactions were designed as tax avoidance transactions, rather than as profit making enterprises. The parties stipulated that all of the appellants received copies of the promotional materials distributed by Rothmetal. Joint Appendix, Volume II at 385. In Rice's Toyota, this court relied heavily on similar promotional materials to conclude that the taxpayer's sole motivation in entering into a sale and leaseback transaction was tax avoidance. 752 F.2d at 92. Furthermore, in Thomas v. Commissioner, this court relied on an offering memorandum--a form of promotional material--in finding that the taxpayers lacked the requisite primary profit motive in entering into a mining venture. "The significance of the offering memorandum is its emphasis on the favorable tax consequences of the program in comparison to its superficial analysis of profitability." 792 F.2d at 1260. Citing Rice's Toyota, the court noted that " ... precedent sustains the Tax Court. The inferences that it drew from the offering memorandum were reasonable and relevant." Id.
 
 
 50
 A second factor relied upon by the Rice's Toyota court in determining motive was that the taxpayer therein was in fact able to take large deductions as a result of his transactions, just as the promotional materials had promised. As in Rice's Toyota, the actual results of the London options transactions were entirely consistent with the representations made in the various promotional materials. Every petitioner before the court in Glass, including the taxpayers herein, no matter when the trades were opened, no matter when the closing trades took place, no matter what commodities were traded, received, as a result of closing sold options, an ordinary loss in the first year of the program and an approximately offsetting capital gain in the following year. The five taxpayers involved in this appeal each took an average of $14,314.40 in deductions as a result of their London option transactions.[11]
 
 
 51
 The second prong of the Rice's Toyota test, the "economic substance" inquiry "requires an objective determination of whether a reasonable possibility of profit from the transaction existed apart from the tax benefits." 752 F.2d at 94. In its opinion the Tax Court explicitly rejected the petitioners' argument "that under the London options transaction, there was a reasonable prospect for a profit." 87 T.C. at 1174. Again, we find that the holding of the Tax Court is fully supported by the objective facts in the record.
 
 
 52
 The only possible profit objective in these transactions was that one could profit from a "difference" gain.[12] 87 T.C. at 1173. All of the Glass petitioners, however, had "in every instance entered into closing transactions on sold options in year one of the straddle operation" in order to create ordinary losses. Id. at 1176 (emphasis in the original). The evidence demonstrates that the broker/dealers were able to create these losses, with the taxpayers' permission, by manipulating four elements: pricing, premiums, contangos and commissions.
 
 
 53
 1. Pricing. Prices established by the LME stand as the daily world-wide benchmark and are based upon ring trading.[13] Wide variations from the official daily price could only be caused by events outside the influence of the parties to the trade, such as an announced shortage of the metal, a currency devaluation, or a dramatic change in interest rates. None of these things occurred during the years in question. Nevertheless, the Tax Court found:
 
 
 54
 [T]he prices used by the broker/dealer and petitioners for the futures trades were frequently far afield from official prices, as evidenced by the use of nonmarket contangos. As a result, excess gains or losses resulted, and always in the right amounts to bring the accounts to zero.
 
 
 55
 87 T.C. at 1160. Because the London options transactions were arranged so that no petitioner was ever returned any of his original investment, they resembled not so much investments as purchases by the taxpayers, for a fee equal to the amount of the original investment, of ordinary tax losses.
 
 
 56
 2. Premiums.--As the Glass court noted, "it was the 'plugged' option premiums which caused the ordinary losses which are the subject of this case." Id. Usually the amount of premium paid for an option is determined through negotiation between buyers and sellers. In these cases, however, Rothmetal set the premiums unilaterally. The premium normally will reflect two factors: (1) the option's intrinsic value[14] and (2) its time value.[15] The evidence shows, however, that:
 
 
 57
 [i]nstead of letting the market dictate premiums based on the underlying fair market strike price, the brokers kept the strike prices the same, and by doing so they were able to select the premiums needed to produce the amount of loss purchased by petitioners. Each petitioner paid more to buy an offsetting option than he received when he sold the countervailing option, even though time had elapsed and the option was closer to declaration. Since time is one of the basic underpinnings of options and option pricing, one would expect under normal circumstances, and with all other things being equal, that with the lapse of time the grantor would pay less to buy back a closing transaction option than he received when initially selling the countervailing option and thus realize a profit. In this case, every petitioner had a net loss on granting options. The premiums therefore could not have been a fair market price.
 
 
 58
 Id. (footnotes omitted).
 
 
 59
 3. Contangos--Under normal market conditions, the cash price for immediate delivery will be less than the price for future delivery. The difference between these prices is called the contango, or spread differential. The major component of the contango is interest rates, i.e., the cost of financing for the period involved. Other components include the cost of insuring and storing the metal. Assuming constant interest rates, a contango widens in an arithmetic progression. This means that the difference in price between any two adjacent dates would be the same. Yet, as the Tax Court noted, "the evidence in this case clearly demonstrates that contangos were adjusted by the brokers in order to arrive at a predetermined outcome." 87 T.C. at 1161.
 
 
 60
 4. Commissions--Broker/dealers charge fees in the form of commissions for executing options transactions. Between a broker/dealer and a client, such as the taxpayers in this appeal, commissions are normally based on a percentage of the strike price of the option. With the London options transactions, however, commissions were either charged at varying rates or not at all, depending upon the gain or loss objective sought. When commissions were charged they were determined by the broker/dealer without the taxpayers' knowledge or consent, they "were not routinely charged on each leg of straddles, as is customary in orthodox trading, and lump-sum commissions were sometimes charged in advance of trading without knowing in advance how much trading was to be done over a period of time and at what prices." Id.
 
 
 61
 By manipulating these four elements, and by therefore intentionally skewing the transactions to realize year one losses, the petitioners "prohibitively stack[ed] the deck against the chances of significant financial success." Id. at 1174. Given these intentionally incurred losses, which defeated any possible profit objective of the London options transactions, we must uphold the Glass court's finding that "the London options strategy was a 'mere device which put on the form of [commodity option and fixtures transactions] as a disguise for concealing its real character,' the obtaining of unallowable loss deductions. As such, the London options transaction lacked economic substance and was a sham." 87 T.C. at 1176.
 
 V.
 
 62
 For the reasons set forth above we affirm the decisions of the Tax Court entered with respect to all of the taxpayers herein.
 
 
 63
 AFFIRMED.
 
 
 
 [1]
 The price at which the commodity will be delivered
 
 
 [2]
 One day prior to delivery for every month of the option
 
 
 [3]
 A forward contract is an agreement to buy (long) and sell (short) a specific quantity of a commodity at a specified price at a date certain in the future
 
 
 [4]
 26 U.S.C. Sec. 1092 (1986)
 
 
 [5]
 26 U.S.C. Sec. 165(c)(2)
 
 
 [6]
 Both Helvering and Early, involved interpretations of Sec. 23(e) of the I.R.C. The section was renumbered in the Tax Reform Act of 1954, but the language remains the same
 
 
 [7]
 This decision vacated the court's earlier holding that the 1986 version of Sec. 108 also included the objective "reasonable expectation of profit" test. Landreth v. Commissioner, 845 F.2d 828 (9th Cir.1988)
 
 
 [8]
 Although evidence of the appellants' specific transactions with Rothmetal was introduced as an exhibit at trial (Exhibit # 1368), the parties apparently elected not to include this exhibit as part of the Joint Appendix. However, evidence regarding the appellants' individual transactions was available to the Tax Court
 
 
 [9]
 Interpreting Sec. 183, the "hobby loss" provision of the I.R.C
 
 
 [10]
 Interpreting Secs. 162(a) and 616(a) of the I.R.C
 
 
 [11]
 The actual amounts deducted ranged from $10,148.00 to $24,647.05
 
 
 [12]
 The net difference between loss and gain when all of the positions have been closed out upon the completion of trading
 
 
 [13]
 The "ring" is that part of the exchange where formal trading occurs. Formalized ring trading takes place twice each day during morning and afternoon sessions. Each metal is traded twice during each session in five minute "rings." After the close of the final ring of the morning session, the LME quotations committee announces the official buyers' and sellers' prices for the metals traded. The official prices are merely the last bid and offer prices prevailing at the close of the ring. The London Financial Times reports the closing price of silver for the afternoon session as the "LME close." The closing prices of all other LME traded metals are reported as the "PM unofficial."
 
 
 [14]
 The relationship between the strike price and current forward price of the underlying commodity
 
 
 [15]
 The amount of time left until the option's declaration date