JERRY ETSHOKIN AND JANET M. ETSHOKIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Etshokin v. Commissioner
Docket No. 25789-86
United States Tax Court
T.C. Memo 1990-271; 1990 Tax Ct. Memo LEXIS 357; 59 T.C.M. (CCH) 753; T.C.M. (RIA) 90271; May 31, 1990, Filed *357 Decision will be entered for the petitioners. Susan M. Carlson, Elaine T. Karacic, and Robert L. Byman, for the petitioners. James S. Stanis, Judith M. Picken, and William Miller, for the respondent. CLAPP, Judge. CLAPP
*1023 MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a $ 65,815.16 deficiency in petitioners' Federal income taxes for the 1979 taxable year and a $ 117,837.63 deficiency for the 1980 taxable year. The issue is whether petitioner's losses from soybean future straddles are allowable under section 108 of the Tax Reform Act of 1984, Pub. L. 98-369, 98 Stat. 494, 630, as amended by section 1808(d) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2817-2818. Respondent also asserts the increased rate of interest under section 6621(c) (formerly section 6621(d)). All section references, with the exception of section 108, are to the Internal Revenue Code for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT We incorporate by reference the stipulation of facts and attached exhibits. Petitioners resided in Chicago, Illinois when they filed their petition. Janet M. Etshokin is a petitioner *358 only because she filed a joint Federal income tax return with her husband. Accordingly, all references to "petitioner" will be to Jerry Etshokin. 1. Commodity Futures Trading
A commodity futures contract is a firm commitment to deliver or to receive a specified quantity of a commodity during a specified month in the future at a specified price. A futures contract may be offset by taking the opposite position in the same commodity for the same month at the current market price. A person who sells a commodity futures contract is obligated to deliver the commodity in the specified delivery month; this is referred to as taking a short position. A person who buys a commodity futures contract is obligated to accept delivery of the commodity in the specified delivery month; this is referred to as taking a long position. A commodity futures straddle involves simultaneously holding a long position in a commodity for one delivery month and a short position in the same commodity for a different delivery month. The long position and the short position are commonly referred to as the "legs" of the straddle. The term "spread" refers to the difference in price between the commodity futures contracts *359 for the two delivery months. The economic profit or loss of an individual long or short commodity futures position is directly affected by changes in the direction of the market. On the other hand, the economic profit or loss of a commodity futures straddle is affected only by whether the spread widens or narrows. Whether the spread widens or narrows depends on the relative movements of the prices between the two delivery months of the straddle. *1024 If the long position of the straddle is in the nearby delivery month and the short position is in the distant delivery month, the spread -- if it narrows -- will show a net economic profit, regardless of the direction of the overall market. For example, if in a rising market the price of the contracts for the nearby month is rising faster than the price of the contracts for the distant month, the spread will narrow, resulting in the profit on the long position in the nearby month exceeding the loss on the short position in the distant month. Similarly, if in a falling market the price of the contracts for the distant month is falling faster than the price of the contracts for the nearby month, the spread will narrow, resulting in the profit *360 on the distant month exceeding the loss on the nearby month. But, there is a risk in either a rising or falling market that the spread could widen rather than narrow. This could happen if, for example, in a rising market various market factors were to cause the price of the contracts for the distant month to rise faster than the price of the contracts for the nearby month. The opposite of the foregoing is true where the long position of the straddle is in the distant delivery month and the short position is in the nearby delivery month. Under these circumstances, the straddle will show a net economic profit only if the spread widens. Conversely, such a straddle will show a net economic loss if the spread narrows. Several factors can affect the movement of the spread. A significant factor which affects the amount of the spread between two delivery months is the estimated carrying charges. Carrying charges are the costs associated with taking delivery of a commodity in the nearby month and holding the commodity until the distant month. Carrying charges primarily consist of interest, storage, and insurance costs. Other factors also affect the movement of a spread. For instance, *361 economic conditions, expectations as to the size of the pending crop, weather conditions, political factors, demand, and merchandising considerations can all affect the spread between two delivery months. These factors can cause a spread to be wider or narrower than the amount of the estimated carrying charges. Because a loss on one leg of a straddle is accompanied by a gain on the other leg, a straddle has less risk than an individual, or open, position. Similarly, a balanced straddle has less risk than an unbalanced straddle. Due to the differences in risk, the Chicago Board of Trade (CBOT) margin requirements for straddles are less than for open positions. A "butterfly straddle" is a straddle consisting of at least four legs. It is essentially a combination of two straddles that, when drawn schematically, looks to some like a butterfly. For example, the following would be a butterfly straddle: Short January 1980
Short May 1980
Long March 1980
Long March 1980
2. Petitioner's Commodity Futures Trading
After graduating from college, petitioner worked for 6 years as an over-the-counter securities trader for A. G . Becker & Company in Chicago, and for 8 years in the same position with *362 J. M. Dain & Company (Dain) in Minneapolis. After leaving Dain in 1968, he became the part owner and manager of M. J. Bishop & Company, a securities trading firm. In 1971, petitioner returned to Dain, where he established an institutional options department. In 1974, he joined Dain's stock options department. In 1975, petitioner returned to Chicago to trade stock options as a market maker on the floor of the Chicago Board Options Exchange (CBOE). As a market maker, he traded exclusively for his own account through a market-maker options account and an investment options account. Petitioner leased a seat on the CBOE from 1975 until his retirement in 1987. In early 1979, petitioner entered into an office sharing arrangement with the commodity trading brokerage firm of Mayer-Gelbort, Inc. (MGI). MGI primarily cleared trades for commercial firms and did not have a tax straddle department. Petitioner frequently spoke to Robert Gelbort (Gelbort) of MGI about commodities futures trading. On May 7, 1979, petitioner opened a commodity futures trading account with MGI and made an initial margin deposit of $ 10,000 as a guarantee he would honor the contracts when due. He made additional *363 margin deposits in the amounts of $ 10,000 on June 21, 1979, $ 25,000 on April 9, 1980, and $ 10,000 on August 5, 1980. Petitioner closed out his MGI account in June 1981, receiving a return of his $ 52,152.64 account balance. All of petitioner's commodity futures trades occurred on the CBOT during regular trading hours and in accordance with the rules and regulations of the CBOT. Petitioner traded both open positions and straddles, and made his trades with the advice of Gelbort. Petitioner would close out or liquidate an individual position or the long or short position of a straddle by purchasing or selling an offsetting position for the same commodity in the same delivery month. Petitioner engaged in 50 soybean futures straddle trades from May 15, 1979 through January 5, 1981, as follows: *1025 JERRY ETSHOKIN SOY BEAN FUTURE TRANSACTIONS OPENED IN 1979 TRADE
* CONTRACTS EXERCISE
TRADE
GAIN OR
LINE
DATE
LONG (SHORT) DATE
PRICE
(LOSS)
1
5/15/79
300
MAR 80
$ 7.3300
2
5/15/79
-300
JAN 80
$ 7.2150
BALANCE 5/15/79
3
6/14/79
130
JAN 80
$ 8.1725
($ 124,878.00)
4
6/14/79
-130
MAY 80
$ 8.3550
BALANCE 6/14/79
5
10/8/79
10
NOV 79
$ 7.0300
BALANCE 10/8/79
6
10/12/79
-10
MAR 80
$ 7.1750
($ 1,581.00)
BALANCE 10/12/79
7
10/30/79
-10
NOV 79
$ 6.3800
($ 6,531.00)
8
10/30/79
10
JAN 80
$ 6.6175
$ 5,944.00 BALANCE 10/30/79
9
10/31/79
160
JAN 80
$ 6.7000
$ 81,904.00 10
10/31/79
-130
MAR 80
$ 6.9275)
($ 64,371.00)
11
10/31/79
-30
MAR 80
$ 6.9450)
BALANCE 10/31/79
12
11/5/79
130
JAN 80
$ 6.7000
13
11/5/79
-125
MAR 80
$ 6.9175)
($ 54,015.50)
14
11/5/79
-5
MAR 80
$ 6.9200)
BALANCE 11/5/79
15
11/28/79
85
MAR 80
$ 6.9350
16
11/28/79
-45
JAN 80
$ 6.6600)
($ 1,140.50)
17
11/28/79
-85
JAN 80
$ 6.7125)
18
11/28/79
45
MAY 80
$ 7.0725
$ 57,576.50 BALANCE 11/28/79
19
12/20/79
-85
MAR 80
$ 6.8500
($ 7,100.50)
20
12/20/79
85
JUL 80
$ 7,2425
BALANCE 12/20/79
21
1/3/80
85
MAY 80
$ 6.8750
$ 125,527.00 22
1/3/80
-85
JUL 80
$ 7.0700
($ 14,935.50)
BALANCE 1/3/80
*364 Note: Figures exclude commissions of fees. NET REALIZED
POSITION AT END OF DAY
GAIN (LOSS)
LINE
TO DATE
NOV 79
JAN 80
MAR 80
MAY 80
JUL 80
1
300
2
-300
-300
300
3
130
4
-130
($ 124,878.00)
-170
300
-130
5
10
($ 124,878.00)
10
-170
300
-130
6
-10
($ 126,459.00)
10
-170
290
-130
7
-10
8
10
($ 127,046.00)
-160
290
-130
9
160
10
-130
11
-30
($ 109,513.00)
130
-130
12
130
13
-125
14
-5
($ 163,528.50)
130
-130
15
85
16
-45
17
-85
18
45
($ 107,092.50)
85
-85
19
-85
20
85
($ 114,581.00)
-85
85
21 85
22
-85
*1026 JERRY ETSHOKIN SOY BEAN FUTURES TRANSACTIONS OPENED IN 1980 TRADE
* CONTRACTS EXERCISE
TRADE
GAIN OR
LINE
DATE
LONG (SHORT) DATE
PRICE
(LOSS)
1
4/9/80
200
NOV 80
$ 6.6200
2
4/9/80
-200
JAN 81
$ 6.7900
BALANCE 4/9/80
3
4/15/80
-200
NOV 80
$ 6.4475
($ 35,140.00)
4
4/15/80
200
MAR 81
$ 6.7950
BALANCE 4/15/80
5
6/27/80
200
JAN 81
$ 7.0650
($ 56,240.00)
6
6/27/80
-100
MAY 81
$ 7.3500
7
6/27/80
-100
MAY 81
$ 7.3550
BALANCE 6/27/80
8
6/30/80
** 170 JAN 81
$ 7.1900
9
6/30/80
-200
MAY 81
$ 7,4800
BALANCE 6/30/80
10
7/3/80
** 5
JAN 81
$ 7.5500
BALANCE 7/3/80
11
7/7/80
** 5
NOV 80
$ 7.4650
BALANCE 7/7/80
12
7/9/80
-400
JAN 81
$ 7.6800
13
7/9/80
400
MAY 81
$ 7.9650
($ 221,180.00)
BALANCE 7/9/80
14
7/22/80
JAN 81
$ 85,341.00
BALANCE 7/22/80
15
9/8/80
10
NOV 80
$ 8.480
BALANCE 9/8/80
16
9/11/80
-10
NOV 80
$ 8.4850
$ 5,063.00 BALANCE 9/11/80
17
9/24/80
-5
NOV 80
$ 8.6400
$ 769.00 18
9/24/80
5
JAN 81
$ 8.8200
($ 5,731.00)
BALANCE 9/24/80
19
9/30/80
50
JAN 81
$ 6.3150
($ 32,060.00)
20
9/30/80
-50
MAY 81
$ 8.7100
BALANCE 9/30/80
21
10/2/80
150
JAN 81
$ 8.2500
($ 86,415.00)
22
10/2/80
-150
MAY 81
$ 8.6450
BALANCE 10/2/80
23
10/7/80
10
MAY 81
$ 8.8500
($ 1,461.00)
BALANCE 10/7/80
24
10/8/80
-10
MAY 81
$ 8.9300
BALANCE 10/8/80
25
11/10/80
-40
MCH 81
$ 9.4100
$ 104,356.00 BALANCE 11/10/80
26
11/11/80
30
MAY 81
$ 9.6200)
27
11/11/80
10
MAY 81
$ 9.6250)
($ 36,694.00)
BALANCE 11/11/80
28
1/5/81
-160
MCH 81
$ 8.5500
$ 279,808.00 29
1/5/81
160
MAY 81
$ 8.8025
($ 23,342.00)
BALANCE 1/5/81
*365 NET REALIZED
POSITIONS AT END OF DAY
GAIN (LOSS)
LINE
TO DATE
MAR 80
NOV 80
JAN 81
MAR 81
MAY 81
1
200
2
-200
200
-200
3
-200
4
200
($ 35,140.00)
-200
200
5
200
6
-100
7
-100
($ 91,380.00)
200
-200
8
170
9
-200
($ 91,380.00)
170
200
-400
10
25
($ 91,380.00)
195
200
-400
11
5
($ 91,380.00)
5
195
200
-400
12
-400
13
400
($ 312,560.00)
5
-205
200
14
($ 227,219.00)
5
-205
200
15
10
($ 227,219.00)
15
-205
200
16
-10
($ 222,156.00)
5
-205
200
17
-5
18
5
($ 227,118.00)
-200
200
19
50
20
-50
($ 259,178.00)
-150
200
-50
21
150
22
-150
($ 345,593.00)
200
-200
23
10
($ 347,054.00)
200
-190
24
-10
($ 347,054.00)
200
-200
25
-40
($ 242,698.00)
160
-200
26
30
27
10
($ 279,392.00)
160
-160
28
-160
29
160
($ 22,926.00)
*1027 *1028 During 1979, petitioner also engaged in 22 other commodity futures trades, 14 of them involving corn, 6 involving soybeans, and 2 involving wheat. During 1980, he engaged in 61 other futures trades, 45 of them involving corn and 16 involving soybeans. From January 6, 1981, until June 26, 1981, petitioner engaged in an additional 50 straddle and open trades, 15 involving soybeans and 35 involving corn. Petitioner has not opened a commodity futures position since June 23, 1981, and has *366 not traded in commodity futures since he closed his last position on June 26, 1981. Petitioner's Federal income tax returns included the following income: 1979
1980
1981
Long-term capital gain
from commodity futures
--
$ 104,600
* $ 280,800
Short-term capital gain (loss)
from commodity futures
($ 126,428)
(297,794)
** (3,328)
Short-term capital gain
from stock options
*** 123,031
**** 288,112
175,475
Ordinary income (loss) from
stock options
325,339
254,676
(141,374)
Petitioner's ordinary income from stock options resulted from his market-maker activities. Sec. 1236(a). His short-term capital gain from stock options resulted from his liquidation of certain stock option contracts he had previously transferred from his market maker account to his options investment account. This transfer changed the character of gains or losses on the contracts *367 from ordinary to capital. Sec. 1236(a). Petitioner received advice on this transfer from Dennis Santoni, his accountant. OPINION The issue is whether petitioner's losses from soybean futures straddles are allowable under section 108. The relevant portion of section 108 of the Tax Reform Act of 1984, Pub. L. 98-369, 98 Stat. 494, 630, as amended by section 1808(d) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2817-2818 reads: SEC. 108. TREATMENT OF CERTAIN LOSSES ON STRADDLES ENTERED INTO BEFORE EFFECTIVE DATE OF ECONOMIC RECOVERY TAX ACT OF 1981.
(a) GENERAL RULE. -- For purposes of the Internal Revenue Code of 1954, in the case of any disposition of 1 or more positions -- (1) which were entered into before 1982 and form part of a straddle, and (2) to which the amendments made by title V of the Economic Recovery Tax Act of 1981 do not apply, any loss from such disposition shall be allowed for the taxable year of the disposition if such loss is incurred in a trade or business, or if such loss is incurred in a transaction entered into for profit though not connected with a trade or business. The parties agree that the transactions at issue were straddles within the *368 meaning of section 108. Petitioner does not seriously argue that his straddle losses were incurred in a trade or business. However, petitioner does argue that the straddle losses were "incurred in a transaction entered into for profit * * *." For purposes of section 108(a), a transaction is entered into for profit only if the taxpayer entered the transaction primarily for profit. Boswell v. Commissioner, 91 T.C. 151, 159 (1988). Respondent alleges that petitioner did not enter into straddle transactions primarily for profit but rather to generate losses for income tax purposes while deferring gains to later years. Petitioner bears the burden of proof. Rule 142(a). Petitioner entered into his first soybean straddle on May 15, 1979, when he acquired a short position in 300,000 bushels of January 1980 soybeans and a long position in 300,000 bushels of March 1980 soybeans. By June 14, 1979, both the January 1980 and the March 1980 soybeans had increased in value by close to a dollar, with the spread widening by just over 1 cent. This corresponded to nearly a $ 300,000 unrealized loss on the January 1980 soybeans and a slightly greater unrealized gain on the March 1980 soybeans. On *369 June 14, 1979, petitioner closed out 130,000 bushels (26 contracts at 5,000 bushels per contract) of January 1980 soybeans, realizing a $ 126,428 loss. Respondent points out that if petitioner had closed out 25 contracts his realized loss would have been only $ 121,565. Thus, petitioner closed out the minimum number of contracts that would generate a loss sufficient to offset the $ 123,031 short-term capital gain he had already realized on the options *1029 contracts. Respondent argues that this was no coincidence and demonstrates petitioner's tax motivation. On the same date that petitioner closed out his short position in the 130,000 bushels of January 1980 soybeans, he acquired a short position in an equivalent number of May 1980 soybeans. Such a switch from a loss leg to a similar position in another month is often tax motivated since it enables a loss to be realized while maintaining a straddle for the time necessary to achieve long-term gains or to carry the gain into the next year. See Miller v. Commissioner, 836 F.2d 1274, 1276 (10th Cir. 1988), revg. 84 T.C. 827, 829 (1985). In addition, petitioner now had a "butterfly" straddle, which reduces both the risk of loss and the *370 potential for gain. See Smith v. Commissioner, 78 T.C. 350, 356-357 (1982), affd. without published opinion 820 F.2d 1220 (4th Cir. 1987). For example, if the spread on petitioner's January/March and March/May straddles moved in the same direction, the gain on one straddle would be at least partly offset by the loss on the other straddle. This, respondent argues, is further evidence that petitioner could not have been primarily profit motivated. Respondent alleges that petitioner had realized his desired 1979 tax loss following the June 14, 1979 transactions and did not plan to engage in any further transactions during the remainder of the year. He intended to hold the March 1980 long contracts until 1980, both delaying the realization of gain on those contracts and converting the gain from short-term to long-term capital gain. He also would hold the January 1980 and May 1980 short contracts until 1980, both because the short-term loss on those contracts could not be used in 1979 and because the losses would remain short-term no matter how long the contracts were held. See sec. 1233(b). Subsequent to the June 14, 1979 transactions, the price of soybeans declined. This caused the *371 unrealized capital gain on petitioner's March 1980 long contracts to become an unrealized capital loss. In order to prevent this loss from becoming long term, respondent argues, petitioner had to close out his March 1980 long contracts by November 15, 1979. He closed out these contracts on October 12, October 31 and November 5, 1979, realizing short-term losses of $ 119,967.50. Petitioner now had excess short-term losses, which meant he could realize additional capital gains without incurring any additional tax liability. For this reason, respondent says, petitioner closed out his January 1980 short contracts on October 31, 1979, and a portion of his May 1980 short contracts on November 28, realizing short-term gains of $ 139,480.50. Petitioner's losses now were not quite sufficient to offset his short-term gains, so he realized an additional loss of $ 7,488.50 on December 20, 1979. At the end of 1979, petitioner's realized short-term capital losses exceeded his realized short-term capital gains by $ 3,397. On January 3, 1980, petitioner closed out his remaining soybean straddles, realizing a $ 110,591.50 net short-term capital gain. Petitioner testified that he probably delayed *372 these transactions until 1980 for tax reasons. Following these transactions, petitioner did not enter another soybean straddle until April 9, 1980. Respondent argues that this is evidence that, having achieved his tax objectives for 1979, petitioner had no reason to enter any transactions early in 1980. On April 9, 1980, petitioner established another soybean straddle after realizing substantial capital gain income from other sources. On April 15, 1980, petitioner switched his long position from November 1980 soybean futures to March 1981 soybean futures, realizing a $ 35,140 short-term capital loss. Petitioner engaged in additional switches on June 27 and July 9, realizing short-term losses of $ 56,240 and $ 221,180, respectively. On July 9, he also realized his first gain as to positions opened in 1980, a short-term gain of $ 85,341. On November 10, petitioner realized a $ 104,356 long-term capital gain. Respondent notes that petitioner realized this gain shortly (approximately 2 months) after the gain became long term. Petitioner did a number of other trades during the remainder of the year, including several switches that resulted in significant losses and two trades that *373 resulted in minor gains. After July 9, petitioner's accumulated loss never fell below $ 222,000. Petitioner finished 1980 with a $ 297,794 loss, which exceeded his $ 288,112 gain by $ 9,682. On January 5, 1981, petitioner realized a $ 279,808 long-term capital gain, and a $ 23,342 short-term loss. This pattern of trading, respondent alleges, was tax motivated. We believe respondent overemphasizes the tax significance of petitioner's pattern of trading the soybean straddles. First, the June 14, 1979 transaction does not appear ideal from a tax standpoint. In that transaction, petitioner realized a loss on 130,000 bushels of January 1980 soybeans, yet postponed realization of the loss on the entire remaining 170,000 bushels. Respondent argues this transaction was tax motivated. We note, however, that petitioner could have better balanced his butterfly straddle if he had switched an additional 5,000 to 35,000 bushels to May 1980 soybeans. Since petitioner did not do that, we do not believe that this transaction can be explained entirely on the grounds of tax motivation. Second, petitioner offered plausible explanations for his soybean straddle transactions. He *1030 explained that he *374 entered into the straddle on May 15 because he believed that the spread would widen. However, the market began to rise after June 1, 1979, which caused the straddle to narrow. Petitioner testified that it was probably for this reason that on June 14, 1979, he reduced the overall size of his January/March straddle. He did not close out the entire January/March straddle because he believed that it still had profit potential. Respondent argues that the resulting butterfly straddle is not consistent with a profit motive. However, in fact, this butterfly straddle increased in value by $ 3,050 between June 14 and June 29, 1979. At this time, petitioner had made a total margin deposit of $ 20,000, so his potential rate of return on the butterfly straddle was 15.25 percent. Petitioner's action to close out the January/March straddle on October 31, 1979, also was consistent with a profit motive because, as petitioner explained, by that date it had widened to near full carrying costs, leaving little profit potential. Petitioner was not able to explain all of his transactions, but this is understandable given the number of years since those transactions. Third, petitioner explains he did *375 not enter into any straddles between January 3, 1980 and April 9, 1980, because he did not wish to have any outstanding straddles when Gelbort was on vacation in March 1980. This explanation is consistent with petitioner's actions involving his open trades. Petitioner engaged in several open trades in February 1980, but had no outstanding open trades during March other than 10,000 long bushels of corn, which he closed during March 1980. Fourth, the majority of petitioner's trades do not appear to be tax motivated. These trades include the 22 trades in 1979 and 60 trades in 1980 that respondent does not challenge, and that by themselves comprise more than half of petitioner's futures transactions. In addition, by July 9, 1980, petitioner's realized losses were $ 312,560, which comfortably exceeded his $ 288,112 of total short-term capital gains in 1980. Thus, there does not appear to be any tax explanation for the 13 soybean straddle transactions occurring after July 9, 1980, and before the end of 1980. We believe that petitioner entered most, if not all, of these 1979 and 1980 trades primarily for profit. Because the majority of petitioner's commodity futures trades were primarily *376 for profit, the instant case differs from most of the cases that disallow straddle losses. See Ewing v. Commissioner, 91 T.C. 396 (1988); Smith v. Commissioner, 78 T.C. 350 (1982), affd. without published opinion 820 F.2d 220 (4th Cir. 1987); Fox v. Commissioner,82 T.C. 1001 (1984); Landreth v. Commissioner, 859 F.2d 643 (9th Cir. 1988), reversing on this issue a Memorandum Opinion of this Court; Glass v. Commissioner, 87 T.C. 1087 (1986), affd. sub nom. Harrington v. Commissioner, 854 F.2d 755 (5th Cir. 1988), affd. sub nom. Yosha v. Commissioner, 861 F.2d 494 (7th Cir. 1988), affd. sub nom. Ratliff v. Commissioner, 865 F.2d 97 (6th Cir. 1989), affd. sub nom. Kirchman v. Commissioner, 862 F.2d 1486 (11th Cir. 1989), affd. sub nom. Keane v. Commissioner, 865 F.2d 1088 (9th Cir. 1989), affd. sub nom. Killingsworth v. Commissioner, 864 F.2d 1214 (5th Cir. 1989), affd. sub nom. Friedman v. Commissioner, 869 F.2d 785 (4th Cir. 1989), affd. sub nom. Dewees v. Commissioner, 870 F.2d 21 (1st Cir. 1989); Freytag v. Commissioner, 89 T.C. 849 (1987), on appeal (4th, 5th, 6th Cirs., June 5, 1989). In none of these cases did the taxpayers enter any open or straddle transactions primarily *377 for profit. Thus, there was no doubt about tax motivation, unlike the instant case. We are aware of only one case in which losses on certain straddle transactions were disallowed yet the taxpayer entered other futures transactions primarily for profit. See Miller v. Commissioner, 836 F.2d 1274 (10th Cir. 1988), revg. 84 T.C. 827 (185). In that case, the taxpayer had handled a corporation's commodity futures trading. During an 8-year period, he also made 158 commodity futures trades for his personal account, with 44 of these trades being straddles and the remainder open trades. Four of the straddles were switches, and three of these switches were at issue in the case. The taxpayer utilized the tax straddle department of a large brokerage firm for the challenged trades, but not for his other trades. The working papers of a member of the tax straddle department indicated that the taxpayer had the objective of a specific tax loss, and another member of the department advised the taxpayer as to the strategy to achieve that tax loss. Thus, it was clear that the taxpayer entered the challenged straddles primarily for the tax loss. By contrast, in the instant case respondent infers *378 the tax motivation from the pattern of trades. Accordingly, we do not believe that Miller has much relevance to the instant case. The facts of the instant case are closest to those in Laureys v. Commissioner, 92 T.C. 101 (1989), which involved a taxpayer who was a market maker in options. Respondent sought to disallow losses on certain option spreads, which are not subject to section 108. However, one issue in that case, as in the instant case, was whether the trades were primarily entered into for profit. Laureys v. Commissioner, *1031 supra at 132-134. We noted that the challenged trades were just a portion of the taxpayer's option trades and that the taxpayer explained his transactions. We stated that: Petitioner does not acknowledge any tax motivation, and respondent is relying solely on the results of the transactions, arguing that petitioner's trading was not rational in the absence of anticipated tax consequences. Unlike respondent, however, we will not ignore petitioner's testimony, the possibility of profits if his market opinions proved correct, the credibility of rapidly changing market positions in an extremely volatile market, and the propriety and necessity of minimizing, *379 or hedging, risks in petitioner's business. We are persuaded that petitioner's primary purpose in engaging in options transactions, spread transactions, butterflies, and specifically the transactions in issue, was consistent with and part of his overall portfolio strategy to make a profit. * * * [Laureys v. Commissioner, supra at 133-134.] The instant case differs from Laureys in that petitioner was not engaged full time in the activity in question and did acknowledge that the manner in which he closed out transactions sometimes was tax motivated. However, we do not believe that these distinctions are significant under the facts of the instant case. Accordingly, Laureys provides strong support for petitioner. As further evidence that petitioner was tax motivated, respondent refers to the transfer of certain options to the investment account. This transfer converted the ordinary income on these options into short-term capital gains. Respondent argues that petitioner had no reason to make this transfer unless he intended to create short-term capital losses that would offset the short-term capital gains. This shows, respondent says, that petitioner's creation of the short-term capital *380 losses through straddle trading was part of a premeditated, integrated plan to avoid tax. This argument has several problems. First, petitioner originally transferred options to the investment account at least as early as December 1978, which implies that petitioner would have conceived his plan to manufacture straddle losses by that date. Yet petitioner says he did not seriously consider trading commodity futures until he began to share office space with MGI in 1979, and he did not enter his first commodities trade until May 1979, nearly half a year after he transferred the options to the investment account. Second, it is not inconsistent for petitioner to enter futures transactions primarily for profit yet to take steps to use any losses that might result from the transactions. In the instant case, he could take such steps without incurring any tax detriment because the income on the options would have been taxed at the maximum 70-percent rate regardless of whether the options were in petitioner's market maker account or in his investment account. The options in his market-maker account would not have been taxed at the 50-percent maximum tax rate on earned income because, among *381 other reasons, his use of income averaging prevented him from taking advantage of that lower tax rate. Sec. 1304(b)(3). Third, the premeditated, integrated plan suggested by respondent could apply only to 1979, not to 1980. During most of 1980, petitioner had only a $ 124,962 realized gain on options in his investment account. It was not until December 1980, that he further realized a $ 163,150 gain on contracts transferred to the account in September 1980. This was several months after petitioner's net realized loss had reached $ 227,219. Although petitioner's 1981 year is not before us, we note that petitioner realized a $ 175,475 short-term capital gain in his investment account in 1981, yet in that year his net short-term capital losses from his commodity futures never exceeded $ 40,000. This casts further doubt upon respondent's theory of a premeditated, integrated plan to offset short-term capital gains against short-term capital losses. Respondent notes that petitioner established his last commodities position on June 23, 1981. Section 1092, which now prevents the losses on a commodity straddle from being taken into account before the gains, applies to positions established *382 after June 23, 1981. Respondent argues that this timing was not coincidental and demonstrates petitioner's tax motivation. However, petitioner testified that in late June 1981 he suffered losses in his options trading, and for this reason had to liquidate outside assets to cover the deficit in his options trading account. We note that in 1981 petitioner did in fact suffer a $ 141,374 ordinary loss from his stock options marketmaker account. In addition, petitioner's 1981 trades have no apparent tax motivation because he has not traded in commodity futures since he closed his last position on June 26, 1981. Thus, petitioner did not delay realization of any 1981 gains until 1982, nor did he convert any of those gains to long-term capital gains. Since petitioner's 1981 transactions were not tax motivated, the date on which he terminated his transactions would appear to be irrelevant. Respondent also argues that petitioner could have achieved profits through open trades and, therefore, he had no reason to engage in straddles unless he was concerned with tax losses. However, profits can be made in straddles as well as in open trades, and diversification between the two is a good investment *383 strategy. In addition, margin requirements are lower for *1032 straddles than for open trades, increasing the attractiveness of straddles. The testimony at trial was inconsistent with respondent's theory that petitioner entered the straddles primarily for tax losses. Both petitioner and Gelbort testified that their discussions involved the mechanics of commodity futures trading. As noted above, Gelbort's firm did not have a tax straddle department, and Gelbort testified that he had no knowledge of petitioner's personal tax situation. Dennis Santoni, petitioner's accountant, testified he has never advised clients to use straddles as a tax-saving device. Finally, petitioner testified that he entered the straddles primarily to make a profit. We believe this testimony. Finally, we note that respondent presented an expert witness, J. William Uhrig (Uhrig), who since 1967 has been an agricultural economist in the Department of Agricultural Economics at Purdue University. Most of his career has been devoted to grain marketing. His classes cover the theory behind futures trading on the CBOT, including the theory of commodity straddles. He has traded commodity futures for his own account, *384 has advised others with respect to commodity trades, and has written articles about commodity trading. However, he has never made nor advised anyone with regard to a speculative futures transaction. Uhrig's report contains two parts. One part is a tax analysis. We disregard this part of the report, both because Uhrig has no tax expertise and because it is inappropriate for an expert witness to present a legal analysis. Laureys v. Comissioner, 92 T.C. at 122-129. The other part of Uhrig's report asserts that petitioner's trades were not consistent with a profit motive. For example, Uhrig says petitioner's November 28, 1979, transaction was not ideal because it involved a spread that would be profitable only in a rising market, yet petitioner entered it in a falling market. Uhrig's analysis appears to be based upon the premise that the future direction of the market is likely to be the same as the present direction of the market. We reject this premise. In addition, Uhrig's assertion that petitioner's trades were inconsistent with a profit motive is contradicted by the facts. For example, Uhrig argues that the profit per bushel on petitioner's first straddle could not have been *385 more than 4-1/2 cents. However, such a profit on each of petitioner's 300,000 bushels would have given petitioner a total profit of $ 13,500, or a 135-percent rate of return on his $ 10,000 margin deposit. In addition, the actual spread widened by 12 cents by October 30, 1979, giving a potential profit nearly three times what Uhrig predicted. Uhrig also says petitioner's butterfly spread transaction on June 14, 1979, had very little profit potential. However, as noted above, by June 29, 1979, this butterfly straddle had increased in value by $ 3,050. At this time, petitioner had made a total margin deposit of $ 20,000, so his potential rate of return on the butterfly straddle was 15.25 percent. We also note that Uhrig considered only the straddles and ignored the many open trades that were profit motivated. His analysis would have been more plausible if he had not ignored the transactions which failed to support respondent's position. For all of the above reasons, we give little weight to any portion of Uhrig's report or testimony. We conclude that petitioner entered his straddle transactions primarily for profit. We do not doubt that petitioner also was concerned with tax *386 consequences, but we are convinced this concern was secondary. As noted in Miller v. Commissioner, 836 F.2d 1274, 1279 (10th Cir. 1988), the primarily for profit test "does not mean that losses influenced by tax planning are not deductible * * *. The test of deductibility is one of degree, considering the facts and circumstances surrounding the transaction." Because petitioner entered his straddle transactions primarily for profit, he is entitled to his losses under section 108. Due to our holding on this issue, petitioner is not liable for the increased rate of interest under section 6621(c). Petitioner objected to certain exhibits which respondent wished to enter into evidence. We overrule petitioner's objection and admit those exhibits. We have given them consideration. Decision will be entered for the petitioners. Footnotes
*. CONTRACTS IN THOUSANDS OF BUSHELS↩
*. CONTRACTS IN THOUSANDS OF BUSHELS↩
**. OPEN TRADE STATEMENT MISSING- NO INDICATION OF PURCHASE OTHER THAN OPEN TRADE STATEMENTS↩
*. Should have been reported as $ 317,800↩
**. Should have been reported as ($ 40,328)↩
***. Realized in March and April 1979 on contracts transferred to the investment account in December, 1978.↩
****. Realized $ 124,962 in January 1980 on contracts transferred to the investment account in that month; realized $ 163,150 in December 1980 on contracts transferred in September 1980.↩